Docket No. 82536–Agenda 1–September 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JEFFREY D. RISSLEY, Appellant.

Opinion filed June 19, 2003.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Jeffrey Rissley, pled guilty in the circuit court of Bureau County to charges of aggravated kidnapping and murder. At his capital sentencing hearing, a jury found him eligible for the death penalty and further concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the circuit court sentenced defendant to death on the charge of murder and to a term of 15 years’ imprisonment on the charge of aggravated kidnapping. On direct appeal, this court affirmed defendant’s convictions and sentence. 
People v. Rissley
, 165 Ill. 2d 364 (1995). The United States Supreme Court denied 
certiorari
. 
Rissley v. Illinois
, 516 U.S. 992, 133 L. Ed. 2d 432, 116 S. Ct. 525 (1995).

Defendant thereafter filed a 
pro se
 petition for postconviction relief, which was later amended by his appointed counsel. The State moved to dismiss the petition. The circuit court granted the State’s motion to dismiss in part, and the matter proceeded to an evidentiary hearing on the claims which had not been dismissed. At the conclusion of the hearing, the circuit court denied defendant postconviction relief, and defendant appealed to this court. 134 Ill. 2d R. 651.

On March 15, 2001, this court issued an opinion in which we affirmed the judgment of the circuit court, holding that defendant’s late filing of his petition could not be excused under the culpable negligence exception contained in the Post-Conviction Hearing Act. Following the issuance of our decision, defendant filed a petition for rehearing, in which he argued that our opinion failed to define the term “culpable negligence” and therefore rendered the exception illusory. While defendant’s petition was pending, this court took under advisement 
People v. Boclair
, 202 Ill. 2d 89 (2002), a case in which the constitutionality of section 122–1 of the Post-Conviction Hearing Act was called into question on several levels. In light of this fact, we granted defendant rehearing and ordered the parties to file additional briefs. 155 Ill. 2d R. 367.

 Subsequent to our granting of rehearing, then-governor George Ryan commuted defendant’s death sentence to natural life imprisonment without possibility of parole or mandatory supervised relief. Defendant thereafter moved to dismiss his appeal. We denied the motion on April 4, 2003. As we will explain, the commutation renders moot the sentencing issues that defendant has raised in this appeal. We therefore will confine our discussion to the procedural issue raised by the State and the guilt-phase issues raised in the circuit court. Although we adhere to our original construction of the statute, and find that defendant’s petition was untimely filed, we agree with defendant that our original opinion failed to provide a workable definition of the term “culpable negligence” so as to provide the necessary guidance to our lower courts.

BACKGROUND

This court previously detailed the facts surrounding the crimes for which defendant stands convicted in our opinion on direct appeal. 
Rissley
, 165 Ill. 2d 364. Instead of repeating them here, we will note the pertinent facts from the original proceedings where necessary throughout the body of this opinion.

In October 1995, defendant filed a 
pro
 
se
 postconviction petition pursuant to the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122–1 
et
 
seq
. (West 1994)). The circuit court subsequently appointed counsel to assist defendant, and counsel filed an amended petition on March 1, 1996. Defendant’s 
pro se
 petition and the amended petition contained, in total, some 21 different claims, including a single claim in which it was argued that appellate counsel was ineffective for failing to incorporate and brief the 56 issues raised in the various postsentencing motions filed at the conclusion of the sentencing hearing. The amended petition also realleged each issue that had been raised in defendant’s direct appeal. Taken together, the pleadings presented a wide variety of claims regarding the allegedly ineffective assistance of both defendant’s trial and appellate counsel.

The State initially moved to dismiss the petition as time-barred, arguing that it was filed beyond the time required by section 122–1 of the Act. In response, defendant maintained that his petition had been timely filed. Defendant also argued, in the alternative, that if his petition were to be deemed untimely, the petition need not be dismissed because the delay in filing was not the result of defendant’s culpable negligence, an exception provided for in section 122–1. Defendant contended that he had relied on the advice of his appellate counsel on direct appeal, who informed him that he had three years from the date of his sentencing to file a postconviction petition. Defendant submitted an affidavit from his appellate counsel in which counsel corroborated defendant’s allegations regarding the advice counsel gave to defendant. After a hearing on the issue, the circuit court denied the State’s motion to dismiss the petition.

The State thereafter filed a second motion to dismiss defendant’s petitions. In this motion, the State argued that defendant’s claims were barred by principles of 
res judicata
 and waiver. In addition, the State contended that defendant’s claims failed to allege a substantial constitutional violation such that an evidentiary hearing was warranted. The circuit court heard arguments on the motion, and ultimately dismissed, without an evidentiary hearing, all but four of defendant’s claims. Specifically, the court determined that under this court’s precedent, an evidentiary hearing had to be held with respect to defendant’s claims concerning his ingestion of psychotropic drugs and his failure to receive a fitness hearing. The court further ruled that a hearing was necessary with respect to defendant’s allegations that his trial counsel, John Hedrich, had lied to him in conversations leading up to defendant’s decision to plead guilty. According to defendant’s allegations, Hedrich misrepresented to defendant that his co-counsel, J.D. Flood, and another attorney, Andrea Lyon, both concurred in the decision to plead guilty. Moreover, the court also found that defendant’s allegations that Hedrich omitted certain facts from defendant’s motion to vacate the guilty plea also necessitated an evidentiary hearing, as did defendant’s claim that Hedrich labored under a conflict of interest.

The circuit court thereafter held an evidentiary hearing on each of the claims noted above. At the conclusion of the hearing, the circuit court denied postconviction relief, and defendant filed the instant appeal.

ANALYSIS

We begin first by noting the familiar principles regarding postconviction proceedings. A postconviction action is a collateral attack on a prior conviction and sentence. 
People v. Brisbon
, 164 Ill. 2d 236, 242 (1995); 
People v. Free
, 122 Ill. 2d 367, 377 (1988). As such, the remedy “is not a substitute for, or an addendum to, direct appeal.” 
People v. Kokoraleis
, 159 Ill. 2d 325, 328 (1994). The scope of the proceeding is limited to constitutional matters that have not been, nor could not have been, previously adjudicated. Any issues which could have been raised on direct appeal, but were not, are procedurally defaulted (
People v. Ruiz
, 132 Ill. 2d 1, 9 (1989)) and any issues which have previously been decided by a reviewing court are barred by the doctrine of 
res judicata
 (
People v. Silagy
, 116 Ill. 2d 357, 365 (1987)). In addition to these procedural bars, a defendant is not entitled to an evidentiary hearing unless the allegations set forth in the petition, as supported by the trial record or accompanying affidavits, make a substantial showing of a constitutional violation. 
People v. Coleman
, 183 Ill. 2d 366, 381 (1998). In making that determination, all well-pleaded facts in the petition and affidavits are to be taken as true, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act. 
Coleman
, 183 Ill. 2d at 381. The dismissal of a postconviction petition is warranted only when the petition’s allegations of fact–liberally construed in favor of the petitioner and in light of the original trial record–fail to make a substantial showing of a constitutional violation. 
Coleman
, 183 Ill. 2d at 382. On appeal, the circuit court’s decision to dismiss the petition without an evidentiary hearing is subject to plenary review. 
Coleman
, 183 Ill. 2d at 388-89. Determinations, however, made by the circuit court subsequent to an evidentiary hearing will not be disturbed unless manifestly erroneous. 
People v. Morgan
, 187 Ill. 2d 500, 528 (1999); 
People v. Towns
, 182 Ill. 2d 491, 503 (1998).

I

Before we can address defendant’s appellate contentions, we must first resolve the important threshold matter raised by the State, namely, whether the circuit court erred in failing to dismiss defendant’s petition on timeliness grounds pursuant to section 122–1 of the Act (725 ILCS 5/122–1 (West 1994)). Defendant replies, as he did in the circuit court, that his petition was timely or, in the alternative, that the delay can be excused because it was not due to his culpable negligence. The dates pertinent to the parties’ arguments are as follows: this court issued its opinion affirming defendant’s conviction and sentence on March 30, 1995; defendant filed for a writ of 
certiorari
 in the United States Supreme Court on August 25, 1995; defendant instituted the instant postconviction action in early October 1995; and the Supreme Court denied defendant’s petition for 
certiorari
 on November 27, 1995. Defendant, with the aid of counsel, subsequently filed an amended postconviction petition on March 1, 1996.

Timeliness of the October Petition

Around the time that defendant filed his postconviction petition, the legislature twice amended section 122–1 of the Act (725 ILCS 5/122–1 (West 1994)), which governed the limitations period on the institution of postconviction actions. Defendant refers to both an earlier and a later version of the statute in support of his arguments, but the parties agree that the controlling version of the statute is the version in effect in October 1995, when the petition was filed. See 
People v. Bates
, 124 Ill. 2d 81, 84-86 (1988). That version of the statute provided:

“No proceedings under this Article shall be commenced more than 6 months after the denial of a petition for leave to appeal or the date for filing such a petition if none is filed or issuance of the opinion from the Illinois Supreme Court or 6 months after the date of the order denying certiorari by the United States Supreme Court or the date for filing such a petition if none is filed or 3 years from the date of conviction, whichever is sooner, unless the petitioner alleges facts showing that the delay was not due to his culpable negligence.” 725 ILCS 5/122–1 (West 1994).

We note that the statute was amended yet again January 1, 1996.

The fundamental rule of statutory interpretation is to give effect to the intention of the legislature. We look first to the words of the statute, as the language of the statute is the best indication of the legislative intent. When the statutory language is clear, it must be given effect without resort to other tools of interpretation. It is never proper to depart from plain language by reading into a statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent. 
County of Knox ex rel. Masterson v. The Highlands, L.L.C.
, 188 Ill. 2d 546, 556 (1999); 
People v. Woodard
, 175 Ill. 2d 435, 443 (1997).

Pursuant to the controlling version of the statute, the right to file a postconviction action expired as soon as any of the listed specified time periods had elapsed. In this case, the parties agree that the first such event to transpire was the expiration of six months after the issuance of the opinion from this court affirming defendant’s conviction and sentence. See 725 ILCS 5/122–1 (West 1994). This court issued its opinion affirming defendant’s conviction and sentence on March 30, 1995. Six months elapsed on September 30, 1995. Defendant mailed his postconviction petition to the clerk of the circuit court of Bureau County on October 6, 1995, and the clerk filed the petition on October 10, 1995. Both the mailing and the filing occurred more than six months after this court filed its opinion. Accordingly, the action was commenced too late.

Defendant advocates for a different interpretation of the statute. Defendant notes that prior to a July 1995 amendment the statute only barred the commencement of proceedings after the 
later
 of all of the listed events. See 725 ILCS 5/122–1 (West 1992). Indeed, the only change made to this statute by the July 1995 amendment was to change the word “later” to “sooner.” See Pub. Act 88–678, eff. July 1, 1995. Defendant contends that in this prior version of the statute all of the events listed in the statute “described the termination of direct appeal.” Accordingly, defendant argues, it is “obvious” that the legislature intended to create two limitations periods: six months from the end of direct appeal, or three years after conviction. Defendant urges that the post-July 1995 version of the statute, applicable to him, should be read consistently. Thus, defendant contends that the post-July 1995 version of the statute should be understood as allowing a defendant to file a postconviction petition until the earlier of (a) six months from the end of direct appeal, or (b) three years after conviction.

First, as previously noted, when a statute is clear and unambiguous it is improper to look beyond the plain meaning of its terms. 
County of Knox ex rel. Masterson
, 188 Ill. 2d at 556; 
Woodard
, 175 Ill. 2d at 443. Moreover, even if we were to look beyond the plain language of the statute, defendant’s argument is undercut by the legislature’s subsequent amendment of the statute. Effective January 1, 1996, the legislature again amended the statute, this time removing all references to the issuance of this court’s opinion and to proceedings before the United States Supreme Court. Thereafter, a postconviction proceeding had to be commenced within six months after the denial of a petition for leave to appeal or the date for filing such a petition if none was filed, or 45 days after the defendant filed his or her brief in the appeal before this court (or 45 days after the deadline for filing that brief if no brief is filed), or three years from the date of conviction, whichever occurs sooner. 725 ILCS 5/122–1 (West 1996). By this amendment, the legislature removed any doubt that postconviction petitions must sometimes be filed before the termination of proceedings on direct appeal. Thus, defendant’s appeal to legislative intent would be unconvincing even if it did not run counter to the plain language of the statute.

Defendant also contends that, if read literally, the July 1995 amendment rendered much of the section “meaningless surplusage.” For instance, defendant observes that “six months after the date for filing a cert. [
sic
] petition could never occur sooner than the denial of a petition for leave to appeal, or six months after the issuance of an opinion the cert. petition sought to challenge.” Defendant argues that the legislature could not have intended to render superfluous the language regarding 
certiorari
, and accordingly defendant urges us to give effect to the “true intent” of the legislature by “eliminating the ‘issuance of opinion’ language in construing the statute.”

Defendant bases his argument on the rule that statutes should be construed, if possible, so that no term is rendered superfluous or meaningless. 
Bonaguro v. County Officers Electoral Board
, 158 Ill. 2d 391, 397 (1994). However, defendant overlooks the fact that his suggested interpretation of the statute breaks the very rule of construction upon which he relies, as defendant would have us affirmatively ignore the “issuance of opinion” clause. Accordingly, this argument is not convincing.

We will not ignore the wording of the statute. Section 122–1 speaks in terms of four events–the first revolves around the time frames associated with petitions for leave to appeal. Due to the constitutional requirement of mandatory review of capital cases by this court, the leave to appeal provisions are of no relevance to capital cases. In other words, they do not apply. The second event listed in the statute is the date of the issuance of the opinion from this court. The third is the denial of 
certiorari
 by the United States Supreme Court, and the fourth is three years from the date of conviction. By its July 1995 amendment to the statute, the legislature clearly intended that thenceforth the right to file a postconviction petition would expire upon the occurrence of the 
first 
of any of the listed events. In this case, this court issued its opinion on direct appeal on March 30, 1995. Six months from that date was September 30, 1995. Defendant’s date of conviction was October 9, 1992, three years from which was October 9, 1995. Given that defendant did not file his petition for 
certiorari
 with the Supreme Court until August 25, 1995, it was clear that the September 30, 1995, date was the sooner of the three potential dates. Defendant did not commence proceedings under the postconviction act until more than six months had elapsed after March 30, 1995. Accordingly, by the plain language of the statute, his petition was untimely.

Lack of Culpable Negligence

Having decided that defendant’s petition was indeed untimely under section 122–1, we must next address defendant’s alternative contention, 
i.e.
, that even if the petition is deemed untimely, this court should affirm the circuit court’s determination that the delay was not due to defendant’s culpable negligence. See 725 ILCS 5/122–1 (West 1994).

In his petition, defendant alleged that he filed his postconviction petition in October, even though the Supreme Court had not yet then ruled on his petition for 
certiorari
, “due to the change in the law, which, beginning on July 1, 1995, requires that a Post-Conviction Petition be filed within three years of the imposition of the death penalty or within six months of the denial by the United States Supreme court of a Petition for Writ of Certiorari, whichever is sooner.” Moreover, in response to the State’s motion to dismiss the petition, defendant alleged that when the legislature amended the statute in July 1995, his attorney on direct appeal contacted him and advised him that if defendant wished to institute postconviction proceedings he would now have to do so within three years after his conviction. Defendant attached an affidavit by his direct appeal counsel to his response to the State’s motion to dismiss. In the affidavit, counsel stated that when the legislature amended the statute in July 1995 he so notified all of his incarcerated clients, including defendant. Counsel further averred that he advised defendant that he could not wait until 
certiorari
 was denied, but would have to file his postconviction petition within three years of his October 1992 sentencing. Counsel averred that he did not at any time advise defendant that there was any relevance to the date that this court’s opinion on direct appeal was filed. Counsel also stated that his office–the supreme court unit of the office of the State Appellate Defender–assisted defendant in filing his October 1995 
pro
 
se
 petition.

The circuit court found that defendant had made a good-faith effort to comply with the statutory requirements, and the delay was caused by defendant’s reliance on the advice of his appellate counsel. The court found that, because of this reliance, the delay was not due to defendant’s culpable negligence.

Our inquiry, therefore, must focus on whether defendant’s allegations as presented to the circuit court are sufficient to establish a lack of culpable negligence so as to avoid dismissal of the petition on the basis that it was time-barred. Defendant maintains that because he relied, in good faith, upon the advice of his appellate counsel and made a good-faith effort to comply with the statutory requirement, he was not culpably negligent in his late filing of that petition.

Our resolution of this issue turns upon the meaning of the term “culpable negligence” contained in section 122–1. We note that the legislature did not define the term “culpable negligence” within the body of the Act. This court, however, in our recent decision in 
Boclair
, spoke at length regarding the meaning of the term:

“Culpable negligence has been defined as ‘[n]egligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one’s actions.’ Black’s Law Dictionary 1056 (7th ed. 1999). Culpable negligence has also been defined as ‘something more than negligence’ involving ‘an indifference to, or disregard of, consequences.’ 65 C.J.S. 
Negligence
 §19 (2000). Accord 1 R. Rawle, Bouvier’s Law Dictionary 736 (3d rev. 1914) (stating that ‘culpable neglect would seem to convey the idea of neglect for which he was to blame as is ascribed to his own carelessness, improvidence or folly’).

Our courts have interpreted the ‘culpable negligence’ phrase consistently with these definitions. In 
People v. Wilson
, 143 Ill. 2d 236, 248 (1991), this court impliedly equated culpable negligence with recklessness. We approvingly cited an opinion of the highest court of the State of New York describing culpable negligence as a ‘ “conscious choice of a course of action, in disregard of the consequences” ’ that might follow. 
Wilson
, 143 Ill. 2d at 248, quoting 
People v. Decina
, 2 N.Y.2d 133, 140, 138 N.E.2d 799, 803-04, 157 N.Y.S.2d 558, 565 (1956).

The culpable negligence phrase also appears in several state statutes and court rules (
e.g.
, 55 ILCS 5/3–12013, 3–14044 (West 2000) (Counties Code); 65 ILCS 5/10–1–40 (West 2000) (Illinois Municipal Code); 70 ILCS 1210/30 (West 2000) (Park System Civil Service Act); 70 ILCS 1215/33 (West 2000) (Park Annuity and Benefit Fund Civil Service Act); 70 ILCS 2605/4.33 (West 2000) (Metropolitan Water Reclamation District Act); 110 ILCS 70/46 (West 2000) (State Universities Civil Service Act); 725 ILCS 5/122–1(c) (West 2000) (Post-Conviction Hearing Act); 750 ILCS 50/5 (West 2000) (Adoption Act); 188 Ill. 2d R. 606(c) (Supreme Court Rule 606(c)) and, in interpreting those statutes and rules, Illinois courts have almost uniformly held that culpable negligence entails something greater than ordinary negligence.

For example, under section 2–1401 of the Code of Civil Procedure (735 ILCS 5/2–1401 (West 2000)), courts must often determine whether litigants have exercised due diligence or, conversely, have willfully disregarded the process of the court or were so indifferent to it that they should be chargeable with culpable negligence. See 
Pronto Two Ltd. v. Tishman Speyer Monroe Venture
, 274 Ill. App. 3d 624, 629 (1995); 
Klein v. Steel City National Bank
, 212 Ill. App. 3d 629, 638 (1991); 
Cunningham v. Miller’s General Insurance Co.
, 188 Ill. App. 3d 689, 694 (1989); 
Verson Allsteel Press Co. v. Mackworth Rees, Division of Avis Industrial, Inc.
, 99 Ill. App. 3d 789 (1981).

Likewise, other jurisdictions have defined ‘culpable negligence’ in similar contexts. For example, in 
Holway v. Ames
, 100 Me. 208, 60 A. 897 (1905), the Supreme Judicial Court of Maine defined ‘culpable neglect’ in an analogous context as ‘less than gross carelessness, but more than the failure to use ordinary care.’ 
Holway
, 100 Me. at 211, 60 A. at 898. In other contexts, other courts have defined culpable negligence as something more than mere neglect or more than a mere failure to use ordinary care. 
E.g
., 
Ross v. Baker
, 632 So. 2d 224, 226 (Fla. App. 1994) (holding that ‘[c]ulpable negligence is negligence of a gross and flagrant character which evinces a reckless disregard for the safety of others’); 
State v. Giordano
, 138 N.H. 90, 95, 635 A.2d 482, 484 (1993) (stating that ‘[c]ulpable negligence is something more than ordinary negligence, mere neglect, or the failure to use ordinary care–it is negligence that is censorious, faulty or blameable’).

 *** We find that the ‘culpably negligent’ standard contained in section 122–1(c) contemplates something greater than ordinary negligence and is akin to recklessness.”
 Boclair
, 202 Ill. 2d at 106-08.

We continue to adhere to the definition enunciated in 
Boclair
. This definition more than adequately ensures that the portion of the statute permitting a petitioner to file an untimely petition so long as he “alleges facts showing that the delay was not due to his culpable negligence” (725 ILCS 5/122–1 (West 1994)) does not stand as empty rhetoric. Rather, the definition gives heft to the exception contained in section 122–1, an exception which this court has historically viewed as the “special ‘safety valve’ ” in the Act. 
People v. Bates
, 124 Ill. 2d 81, 88 (1988); see also 
People v. Wright
, 189 Ill. 2d 1, 8 (1999). Finally, this definition comports with our long-held view that the Act in general must be “liberally construed to afford a convicted person an opportunity to present questions of deprivation of constitutional rights.” 
People v. Correa
, 108 Ill. 2d 541, 546 (1985), citing 
People v. Pier
, 51 Ill. 2d 96, 98 (1972). See also 
People v. Kitchen
, 189 Ill.2d 424, 435 (1999) (acknowledging that “the Act should not be so strictly construed that a fair hearing be denied and the purpose of the Act, 
i.e.
, the vindication of constitutional rights, be defeated”). In our view, this construction of this portion of section 122–1 serves to further the laudable aims of the Act, and we will apply it to the case at bar.

Applying the definition to the case at bar, we hold that defendant has established that the delay in filing was not the result of his culpable negligence. Defendant’s conduct cannot fairly be labeled blameable or censorious, nor can it be said that defendant’s actions evince an indifference to the consequences. Defendant remained in constant contact with his direct appeal counsel, whose advice and interpretation of the statute defendant had no reason to question. Defendant prepared his petition in what he had every reason to believe was a timely manner, in fact submitting it to the circuit court in 
advance
 of the date by which counsel had informed defendant the petition must be filed. The State does not dispute these facts, but rather argues that, such conduct notwithstanding, defendant was culpably negligent. We believe, however, that under the circumstances of this case, defendant did indeed establish that the untimeliness of the petition was not due to his culpable negligence. The circuit court in this case specifically found that defendant and his direct appeal counsel “were not acting in bad faith” with respect to preparing the petition for filing. The circuit court also found that “it was reasonable for [defendant] to rely on that [date] when his lawyer told him that.” After reviewing the facts of this case in conjunction with the 
Boclair
 definition of culpable negligence, we hold that the circuit court did not err in denying the State’s motion to dismiss the petition on timeliness grounds.

II

Having concluded that the circuit court did not err in denying the State’s initial motion to dismiss on section 122–1 grounds, we turn to defendant’s appellate contentions. As noted previously, both defendant’s 
pro se
 and amended petitions contained numerous claims of ineffective assistance of counsel. In this appeal, as it was originally briefed to this court, however, defendant identifies only six claims of error, three of which concern the propriety of several rulings made by the circuit court during the postconviction proceedings. Defendant’s final three claims concern the constitutionality of the Illinois death penalty. Before we address the claims relating to the guilt phase of the proceedings, we believe it helpful to set out a somewhat detailed factual recitation of the events leading up to defendant’s sentencing hearing.

Preplea Proceedings

Defendant was arrested on charges unrelated to the present murder on October 10, 1991, in Berrien County, Michigan. While in custody, defendant, after being advised of his 
Miranda
 rights, voluntarily gave statements to federal agents as well as to law enforcement officials from both Michigan and Illinois, in which he admitted his participation in the aggravated kidnapping and murder of six-year-old Kahla Lansing. Kahla, who resided in Spring Valley, Illinois, had been reported missing by her mother on September 28, 1991. Defendant was charged with the crimes and brought to the Bureau County jail.
(footnote: 1) Defendant’s first court appearance occurred on October 11, 1991, after Bureau County officials filed criminal informations against him. The circuit court ruled that probable cause existed to hold defendant on the charges of aggravated kidnapping and first degree murder and denied bond in the case. At a hearing held four days later, the prosecutor advised both defendant and the circuit court of the State’s intention to seek the death penalty in the case. The matter was then scheduled for a grand jury date. The circuit court determined that defendant was indigent and, as a result, appointed counsel to represent defendant. The circuit court also continued its order that defendant be held without bond.

Defendant next appeared in court on October 23, 1991, following the grand jury’s return of a two-count indictment containing charges of aggravated kidnapping and first degree murder. Defendant appeared with his court-appointed counsel, Matthew Maloney, who at that time was the public defender of Bureau County. The prosecutor reiterated the State’s intention to seek the death penalty in the event of a conviction. Defendant entered a plea of not guilty, and a trial date was set for January 6, 1992.

On December 9, 1991, the circuit court received a letter from defendant in which defendant requested the judge’s “consent in the termination of” his attorney. Defendant wrote that he believed his attorney had little interest in his case and asked the judge to appoint him another attorney. This matter was addressed at an emergency status hearing on December 20, 1991. The circuit court asked defendant about the letter, and defendant stated that although the letter had reflected defendant’s thoughts “at that time,” it did not represent his views “at the present.” Defendant informed the court that he was satisfied with his attorney and that he wanted the court to disregard the letter. Several days later, at another status hearing, the court granted the defense’s motion for a continuance, and defendant’s trial date was reset to April 27, 1992. The court also allowed the defense to retain the services of a psychiatrist. On January 8, 1992, the circuit court appointed the Grundy County public defender, J.D. Flood, as additional defense counsel in the case.

On January 14, 1992, Bureau County Public Defender Maloney resigned from office, although the court did not allow him to withdraw from defendant’s case until January 27, 1992. In the interim, attorney John Hedrich was appointed public defender, and Hedrich entered his appearance as defendant’s attorney on January 27, 1992.

In February 1992, the circuit court granted defendant’s motion for a continuance, which caused defendant’s trial date to be changed from April 27 to June 22, 1992. The circuit court also granted defendant’s motion for psychological testing. In addition, defense counsel sought the appointment of an investigator in order to investigate defendant’s claims that a satanic cult had kidnapped Kahla, murdered her in defendant’s presence, and then threatened defendant with harm if he informed authorities of these facts. The circuit court granted this motion at a status hearing held on March 2, 1992. At that same status hearing, an amended indictment with respect to the felony-murder count was read in open court. Defendant was again apprised of the possible penalties he faced in light of the charges, including the death penalty. Moreover, defendant was admonished that he could have either a judge or a jury decide his case, including the death penalty phase. At the conclusion of the reading of the amended count of the indictment, defendant entered a plea of not guilty and reaffirmed his desire for a jury trial. The prosecutor once again noted that the State “does intend to seek the death penalty in this case if there is a conviction.”

Defendant thereafter moved to dismiss the murder charges, arguing that, because the murder took place in Iowa, Illinois courts lacked jurisdiction over the crime. The circuit court denied the motion. During this time, the court also heard evidence with respect to defendant’s motion for a continuance due to the publicity surrounding the crimes. After a two-day hearing, the circuit court denied the motion in late May 1992.

Guilty-Plea Proceedings

On June 11, 1992, defendant changed his plea from not guilty to guilty. The circuit court admonished defendant regarding the rights he was waiving as a result of the guilty plea and the range of punishments that were possible upon conviction. Defendant indicated that he understood his rights and understood the range of potential sentences. When asked if defendant was promised anything in exchange for his plea of guilty, defendant responded in the negative. The State then presented the following information as the factual basis for the plea.

Kahla was last seen roller-skating with her friends outside her home in Spring Valley in the late afternoon of September 28, 1991. When Kahla’s mother was unable to find her daughter, she contacted police, and a search ensued. A witness reported seeing Kahla talking to a man in a red Ford Ranger pickup truck at approximately 6:30 p.m. on September 28, 1991. The man was described as a white male in his mid-thirties, with medium length brown hair.

While the authorities in Bureau County were making inquiries into Kahla’s disappearance, investigators in nearby Knox County were busy looking into an aggravated criminal sexual assault of a 10-year-old child that occurred there on September 27, 1991. As a result of that investigation, defendant was charged with that crime, and a warrant for his arrest was filed. Bureau County authorities learned of the Knox County charges and were informed by Knox County investigators that defendant left Knox County on September 28, 1991, and was heading to Berrien County, Michigan, driving eastward on Route 6, which leads to Bureau County. Defendant’s general appearance and the red Ford pickup truck that he was driving matched the description of the man seen talking to Kahla prior to her disappearance. As a result, Bureau County authorities identified defendant as a suspect in Kahla’s disappearance.

Law enforcement officials in Berrien County, Michigan, arrested defendant on the Knox County charges on October 10, 1991. After waiving his 
Miranda
 rights, defendant agreed to provide authorities with information concerning Kahla’s disappearance. Defendant told authorities that he was traveling from Illinois to Michigan in his red Ford pickup on September 28, 1991. Eventually, defendant detoured into Spring Valley sometime in the late afternoon. Defendant admitted that he was an “active pedophile” and that at that time he “hurt inside” and was seeking a child for “relief.” The defendant explained that he saw Kahla, who was roller-skating in an area defendant described as residential. Defendant stopped his car and engaged Kahla in conversation. Kahla entered defendant’s car after she agreed to go with him to a nearby convenience store to buy a soda. Defendant stopped at the store and purchased two soft drinks and a candy bar. Defendant and Kahla thereafter left the store and drove together in an aimless fashion around Illinois.

Defendant stated that after several hours of travel, he found an abandoned farm, consisting of several buildings, near Clinton, Iowa. The farm was located at the end of dirt road off of a state road. Defendant hid his pickup truck in a pig coop building and then entered the barn. There, he discovered some blankets and old mattresses on the bed of an old truck. Defendant and Kahla slept there. Defendant admitted that, at sunrise, he performed anal intercourse on Kahla, and then they both fell asleep.

According to defendant, both he and Kahla later awoke to the sound of gunshots. Both became frightened because some of the gunshots sounded close in vicinity. Defendant stated that Kahla became hysterical at this point and repeatedly told defendant that they should leave. Defendant was afraid, however, that he might be discovered, and he began to lose control. He then obtained an electric cord from inside the barn and, with Kahla standing face to face with him, he twisted the cord around the back of her neck. Defendant stated that Kahla’s face first turned red, her body then became limp, and she fell to the ground. Defendant checked for a heartbeat and found that Kahla was still alive. Defendant then left the barn in order to find out from where the gunshots had come.

Defendant reentered the barn after he discovered that no one was around the farm. He intended to untie the cord from Kahla’s neck, but when he returned to where she was lying, he could no longer hear a heartbeat. Defendant realized that Kahla was dead and proceeded to hide her body in the upper loft of the barn. Defendant then returned to his pickup truck and left the farm. Defendant proceeded to drive to Michigan, where he remained until his arrest.

During the course of defendant’s interviews, defendant drew a map of the farm where Kahla’s body could be found. Defendant described Kahla’s clothing in detail and noted that he left her body fully clothed except for her roller skates. Subsequently, authorities conducted a search in the area identified by defendant, and Kahla’s body was ultimately found, fully clothed, except for shoes, on the second floor of an abandoned barn. A white electrical cord was wrapped tightly around her neck. The cord matched an electric blanket found at the scene. Investigators also found an old truck, mattresses, and a blue bed sheet on the premises.

An autopsy revealed that the cause of Kahla’s death was ligature strangulation from the electrical cord. Kahla sustained injuries to her anal and vaginal areas. Forensic tests indicated that seminal matter found on Kahla’s underpants and on a bed linen found in the barn could have come from defendant.

Before accepting defendant’s pleas, the circuit court addressed defendant again, inquiring if anyone had made any promises to him or had coerced him to plead guilty. Defendant responded in the negative. Based on the guilty pleas, the circuit court convicted defendant of both aggravated kidnapping and first degree murder. The sentencing hearing was set for August 17, 1992.

Motion to Vacate Proceedings

On June 22, 1992, defendant moved to vacate his guilty plea on the grounds that it was not knowingly or intelligently entered. Defendant argued that his counsel was ineffective for failing to properly advise him concerning the consequences of pleading guilty. Specifically, defendant argued that he was not advised by his attorney that he could waive a trial by jury and that defendant could request a bench trial. In addition, defendant claimed that he was not advised that by entering a guilty plea he was waiving the issue of whether Illinois courts had jurisdiction over the murder charge.

The circuit court held a hearing on the motion to withdraw defendant’s guilty plea. The defense called Andrea Lyon, an experienced death penalty defense attorney, as its only witness. Lyon testified that she discussed defendant’s case with one of defendant’s attorneys. Lyon further testified that she was surprised to learn during this conversation that defendant had pleaded guilty without negotiation and without defense counsel’s conducting an extensive investigation of potential mitigation.

Two witnesses testified for the State. James Reed, a deputy jailor with the Bureau County sheriff’s department, spoke with defendant on June 20, 1992, at the jail. At that time, defendant told him that he did not want to withdraw his plea. Troy Wren, the Bureau County probation officer, also spoke with defendant on June 23, 1992, and defendant told him that he pleaded guilty in order to avoid trial.

After hearing arguments, the circuit court denied defendant’s motion. The court ruled that it had admonished defendant regarding the consequences of entering a guilty plea, including the fact that defendant was waiving the right to have his guilt determined by the court. The court further ruled that it did not believe that by pleading guilty defendant waived the jurisdictional defect that defendant claimed existed in the case. The sentencing hearing was then set to begin August 17, 1992.

Sentencing Hearing Proceedings

After the circuit court denied defendant’s motion to vacate, J.D. Flood sought to withdraw from the case. The circuit court granted the motion and appointed Daniel Bute, an assistant public defender of La Salle County, as co-counsel. According to the postconviction testimony, Bute acted as primary counsel during the sentencing hearing and had complete control over the strategic decisions surrounding the defendant’s case.

During the aggravation portion of the hearing, the State first presented the testimony of 11-year-old S.A. She testified that in the afternoon of September 28, 1991, she was walking to a convenience store with her sister in Kewanee, Illinois. Defendant pulled his red truck alongside the road and asked S.A. for directions to Route 34. S.A. replied that she could not help him, but suggested that he ask for directions at the convenience store. According to S.A., defendant tried to lure her into his truck by offering her a ride to the store. She and her sister declined defendant’s offer and ran home. S.A.’s mother also testified that when she saw her daughters after their return from the store, they told her that a man in a red pickup truck “tried to get them” into the truck with him.

Twelve-year-old A.W. knew defendant because A.W.’s mother and defendant’s ex-fiancee, Debbie, were good friends. Defendant and Debbie spent the night at A.W.’s house in Knox County, Illinois, on September 26, 1991. On the next morning, A.W. was to go to school and defendant was asked to give her a ride. Defendant, however, did not drive A.W. to school. Instead, he stopped first at a grocery store and bought some donuts. He also purchased some makeup for A.W. Defendant then drove around Galesburg for a short time, and then turned onto a country road. Defendant told A.W. that he wanted to teach her how to drive and that there would be “no cops” in the countryside. When they reached a cornfield, defendant attempted to tie A.W.’s hands with duct tape. He stopped, however, when A.W. began to cry. Defendant then took a piece of rope and tied A.W.’s hands together. Defendant rolled the passenger window down and tied the other end of the rope around the outside mirror. He laid A.W. on her back and licked her breasts, and rubbed his penis on her vagina. Defendant then turned A.W. onto her stomach and performed anal intercourse upon her. When defendant finished, he told A.W. that she had a nice body and that, if she wanted to do it again, she could let him know by signaling to him with a hug and a pinch.

Knox County Deputy Sheriff Tina Hartz testified that she investigated the child sexual abuse case concerning defendant and A.W. According to Hartz, about a week after the incident, A.W.’s mother and defendant’s girlfriend became suspicious of defendant when they learned that defendant had given A.W. $40. When they asked A.W. if defendant had wanted anything in return, A.W. told them about the incident in the cornfield, and they subsequently contacted police. A.W. told Hartz that she was too afraid of defendant to say anything immediately after her assault.

Special Agent Bill Hammell of the Illinois State Police also testified for the State. Hammell interviewed defendant after his arrest. During the interview, defendant admitted to Hammell that he had sexually assaulted A.W. Hammell asked defendant if defendant had engaged in sexual contact with any other children. Defendant replied in the affirmative and told Hammell that there were possibly 15 other children with whom he had had such conduct. All lived in Michigan, where defendant had been living prior to September 1991. Defendant said that all of the children were between the ages of 8 and 13 and all were the family members of various people defendant had befriended. According to Hammell, defendant identified several children by name and described the different types of sexual activity he had with each of them, ranging from fondling to oral and anal sex. Hammell contacted authorities in Michigan and relayed to them the information defendant had given him.

Hammell also provided information to the jury regarding defendant’s previous convictions. In July 1983, defendant was living in Dallas County with friends, who had a seven-year-old daughter. Defendant molested the girl on numerous occasions while he stayed at her home. As a result of this activity, defendant was arrested. He ultimately pleaded guilty to the charge of indecency with a child. He received a 10-year prison sentence. Defendant also pleaded guilty to aggravated sexual abuse, which arose from a August 6, 1983, encounter with a 12-year-old boy. In that case, defendant performed oral sex on the boy. Defendant received a 10-year prison term for that crime as well. Defendant served some of the sentences and was later put on probation with counseling. Defendant’s probation was transferred to Iowa, and defendant lived there until 1990, when he moved to Michigan. While living in Michigan, defendant married on April 20, 1990. Hammell also testified that defendant told him that defendant wet his bed when he was a child and that his mother punished him by putting duct tape on his mouth. His stepfather and uncle would then engage in anal intercourse with defendant.

V.S., a 13-year-old, testified that she went camping with defendant and two other minors, including her brother, in Benton Harbor, Michigan, in the summer of 1991. While en route to the campgrounds, the van the group was traveling in became stuck in an orchard. V.S.’s brother and the other minors went to seek help, leaving V.S. alone with defendant, during which time defendant committed an act of anal intercourse upon V.S.

Twelve-year-old T.S. testified that he went to school with defendant’s “stepson” in Benton Harbor during the 1990-91 school year. One night, T.S. was at the home of defendant’s grandmother with defendant. After watching televison with defendant, T.S. and defendant went to defendant’s bedroom. There, defendant pulled on T.S.’s penis until he was told to stop.

Ten-year-old D.H. met defendant at the home of his sister’s friend in Michigan in 1990. While there, D.H. and defendant worked in a garage on a motor. According to D.H., defendant grabbed him and attempted to remove D.H.’s clothing.

 J.S., an 11-year-old girl, recounted that in the summer of 1991, she awoke one night while staying at the home of defendant’s grandmother and found defendant in her room. He had removed her underwear and was performing oral sex upon her.

Joann Danfell, a Berrion County, Michigan, deputy sheriff, testified that she conducted an child sexual abuse investigation in Michigan at the request of Bureau County authorities. As a result, she interviewed T.S., D.H., and J.S. Each child told her of incidents of sexual contact with defendant.

Bureau County Deputy Sheriff Jim Reed testified that defendant attempted to escape from the jail by removing bricks from his cell wall. After Reed had thwarted the attempt and reported the incident, he found that defendant had attempted suicide by hanging himself. Reed rescued defendant. Defendant became violent at that time. Defendant was treated at a hospital for his injuries and then returned to the jail.

Finally, the State called the victim’s mother to testify as to the impact defendant’s crimes in this case had on her and the rest of the victim’s family.

Defendant presented several expert witnesses in mitigation in order to establish that defendant was suffering from a mental disturbance at the time of the murder. Dr. George Savarese, a licensed clinical social worker, conducted a psychosocial developmental history of defendant. In so doing, Dr. Savarese interviewed defendant and reviewed various police and medical reports as well as defendant’s school records. Dr. Savarese also reviewed interviews of defendant’s family, neighbors, teachers, and employers. Dr. Savarese concluded from the information that defendant suffered from mental problems that were attributable to traumatic events throughout defendant’s life. For example, defendant’s father committed suicide five months before defendant’s birth. In order to cope with the loss, defendant’s mother was heavily tranquilized while pregnant with defendant. After defendant’s birth, his mother married a man who also reportedly committed suicide, and one of defendant’s brothers was diagnosed with leukemia. Another brother died of sudden infant death syndrome. Dr. Savarese believed that these traumatic events took a heavy emotional toll on defendant’s mother and prevented the normal mother-child bonding that occurs during a child’s formative years.

Dr. Lyle Rossiter, a licensed psychiatrist, also testified on defendant’s behalf. According to Dr. Rossiter, defendant suffered from a severe borderline personality disorder with sociopathic features and pedophilia. Dr. Rossiter noted the same childhood events that Dr. Savarese had described and confirmed that the incidents had a negative effect on defendant’s development. Dr. Rossiter pointed out that there were early indications of defendant’s developmental problems, such as defendant’s being diagnosed with attention deficit disorder and defendant’s history of delayed speech development.

Both Dr. Rossiter and Dr. Savarese also noted that defendant reported suffering from sadistic sexual abuse by his stepfather and mother. Defendant claimed to have been the victim of childhood incest. Neither witness, however, could confirm whether these incidents actually occurred or whether they were fabricated by defendant. Nevertheless, each stated that his diagnosis would not change even if the events had been fabricated because such fantasies were consistent with defendant’s mental problems.

Dr. Diane Alber, a psychologist, testified that she treated defendant as a condition of defendant’s release from prison in 1984. She described defendant as being unable to cope with stress and suffering from depression. Defendant fantasized about romantic relationships with young girls and that he was impulsive, immature, and progressively unable to distinguish between reality and fantasy. 

The foregoing provides the factual backdrop relevant to our discussion of the issues arising from the guilt phase of the proceedings. We address these issues in turn.

Psychotropic Drug Issue

Defendant maintains that he is entitled to an automatic reversal for new trial proceedings because he failed to receive a fitness hearing that he was entitled to receive by statute. Defendant correctly notes that at the time of his trial proceedings, section 104–21(a) of the Criminal Code of 1961 provided that

“[a] defendant who is receiving psychotropic drugs of other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication.” 725 ILCS 5/104–21(a) (West 1992).

Citing to this court’s decisions in 
People v. Brandon
, 162 Ill. 2d 450 (1994), and 
People v. Nitz
, 173 Ill. 2d 151 (1996), defendant argues that the circuit court erred in concluding that a new trial was not necessary despite the fact that defendant was taking psychotropic medication while he was awaiting trial at the Bureau County jail.

Defendant alleged in his 
pro se
 postconviction petition that on April 10, 1992, defense counsel filed an emergency motion for a psychiatric examination in the wake of defendant’s attempted escape from the Bureau County jail and his attempt at suicide. Defendant further alleged that the circuit court denied the request.
(footnote: 2) Defendant argued that his trial counsel was ineffective for failing to advise the circuit court that defendant, “for the duration of his time in the Bureau County Jail, had been receiving prescribed medication.” The petition listed the following drugs that defendant had been given: propoxyphene, docusate sodium, cephalexin, imipramine, Xanax, penicillin, and ibuprofen. Defendant claimed that his trial counsel’s ineffectiveness in this area deprived him of the fitness hearing to which he was entitled, and that a new trial was necessary.

The State sought dismissal of this claim on the basis of waiver. The circuit court denied the State’s motion, ruling that defendant’s allegations as set forth in his 
pro se
 complaint warranted further factual inquiry, at an evidentiary hearing, pursuant to this court’s decision in 
People v. Britz
, 174 Ill. 2d 163 (1996).

Defendant did not present any evidence at the ensuing evidentiary hearing as to this particular claim because it was defendant’s position that, under this court’s opinion in 
Brandon
, reversal was “automatic” given defendant’s ingestion of psychotropic drugs while awaiting trial. The State called Phyllis E. Amabile, M.D., who was the principal witness at the hearing. Dr. Amabile, a licensed physician and board-certified psychiatrist, examined defendant’s medical log and determined that defendant received four different psychotropic drugs while in custody at the Bureau County jail–Xanax, Vistaril, Imipramine, and Ativan. Specifically, from November 1, 1991, through November 13, 1991, defendant received 49 doses of 0.5 milligrams of Xanax. Defendant, also received on November 1, 1991, one 100-milligram dose of Vistaril. From December 27, 1991, through January 1, 1992, defendant received six doses of 50 milligrams of Imipramine. The records further revealed that on January 8, 1992, defendant received one 2-milligram dose of Ativan, and that on March 16, 1992, he received one 100-milligram dose of Vistaril. According to Dr. Amabile, because defendant received only a single dose of Ativan on January 8, 1992, it was extremely unlikely that the drug would have had an effect on defendant’s central nervous system. Similarly, the single doses of Vistaril, administered on November 1, 1991, and once on March 16, 1992, were also too isolated to have had an adverse effect on defendant. Dr. Amabile characterized defendant’s six doses of Imipramine, administered December 27, 1991, to January 1, 1992, to be “non-therapeutic” and were not “sufficiently proximate” in time to the trial proceedings which commenced some six months later in June 1992 to have “affected [defendant’s] mental functioning.” As for defendant’s ingestion of Xanax, which had been prescribed during defendant’s withdrawal from cigarette smoking, Dr. Amabile testified that defendant’s ingestion of the drug was not proximate enough in time to have affected defendant’s mental functioning in June 1992. Dr. Amabile noted that the only drug that defendant took daily while in custody and during his trial proceedings was docusate sodium, a stool softener, which is not classified in any way as a psychotropic drug, nor does it share any of the characteristics of a psychotropic drug. In Dr. Amabile’s medical opinion, none of the drugs ingested by defendant interfered with his ability to understand the nature and purpose of the proceedings against him or to assist in his own defense.

Sergeant Bill Redshaw testified that he was the jail administrator for the Bureau County jail, where defendant was incarcerated from October 1991 to November 1992. According to Redshaw, defendant was kept in a solitary cell for security reasons. Redshaw explained that, due to the nature of the charges against defendant, jail officials feared that defendant would not be safe in the general jail population. Redshaw interacted personally with defendant during the year defendant was held at the jail and the two men were on a first-name basis. Redshaw found defendant to be articulate, intelligent, and cooperative. Defendant was alert, attentive, and did not display any unusual behavior. Redshaw testified that defendant did not appear to suffer from hallucinations, delusions, or confusion. The only time Redshaw saw defendant become agitated was when the Bureau County jail became a “smoke-free” environment, pursuant to orders of the Bureau County board. Defendant, a smoker, was consequently denied his cigarettes and had to adjust accordingly. Redshaw stated that during this period defendant was taking the drug Xanax, which seemed to cause defendant to sleep “quite a bit.”

Redshaw further testified that defendant attempted to escape from the jail on April 7, 1992, and tried to commit suicide. According to Redshaw, on the days preceding April 7, 1992, defendant was alert and did not engage in abnormal behavior. When he returned to the jail, defendant’s behavior did not change. He and Redshaw continued to converse. Redshaw characterized his conversations with defendant at this point in time as clear and lucid. When trial proceedings commenced in June 1992, defendant appeared to understand the nature of his situation and interacted with his lawyers.

John Thompson also testified at the hearing. Thompson was the chief deputy sheriff of Bureau County while defendant was in custody at the Bureau County jail. During that time, Thompson saw defendant on a daily basis until March, 1992. Defendant never appeared to be disoriented or confused. Thompson stated that defendant was inquisitive and “knowledgeable about things that were going on around him, sometimes to the point where it surprised us.” Thompson resumed his duties at the jail on June 12, 1992, the day after defendant entered his guilty plea. Thompson did not notice any difference in defendant’s demeanor from March. Thompson found that defendant remained openly conversational and attentive to himself. According to Thompson, defendant “appeared quite aware of what was going on, to the point of, [defendant] would talk to us with it, about it on a daily basis.” Defendant did not engage in any unusual behavior and appeared to understand and relate to all of the court proceedings that were taking place in the summer and fall of 1992.

James Reed, a deputy for the Bureau County sheriff’s department, also testified. Reed was a jailer during the time that defendant was in an inmate at the jail, and Reed saw him regularly. According to Reed, defendant appeared to be “well aware” of his surroundings and interacted well with everyone. Defendant did not act or appear confused and seemed alert. One of Reed’s duties at the jail was to dispense medication to the prisoners. Reed never saw any behaviorial changes in defendant as a result of the medications he took. Defendant never complained about having any difficulties in his emotional condition. Reed was also responsible for defendant’s security detail during visits to court. During the times Reed took defendant to court, defendant never appeared to be confused or uncomprehending of the nature of the proceedings or what was going on. According to Reed, while in court, defendant appeared to be attentive to his lawyers and to the judge.

Timothy Pierson, another jailer at the Bureau County jail, also testified as to defendant’s demeanor while in custody. Defendant appeared to always be well oriented with respect to time, place, and the circumstances around him. Pierson recalled that defendant was very courteous and expressed anger only twice–when defendant lost his smoking privileges and when Bureau County Public Defender Maloney resigned from office in January 1992. According to Pierson, defendant interacted well with the jail staff and knew all of the different jailers’ work schedules and hobbies.

In ruling on this claim, the circuit court specifically relied upon this court’s opinion in 
People v. Britz
, 174 Ill. 2d 163 (1996). The circuit court determined that, contrary to defendant’s assertions, a new trial was not required because defendant’s psychotropic medicine was not administered to defendant close enough in time to the legal proceedings to have had an adverse effect on him. Citing the testimony of Dr. Amabile, the court found that each of the psychotropic drugs taken by defendant was out of defendant’s system well before the entry of defendant’s guilty plea, the hearing on his subsequent motion to vacate the plea, and the sentencing proceedings. For these reasons, the court concluded that defendant’s trial counsel was not ineffective for failing to utilize defendant’s ingestion of these drugs as a basis for a fitness hearing. As we will explain, we cannot conclude that the circuit court erred in its resolution of this matter.

The failure to receive a fitness hearing pursuant to section 104–21(a) does not require automatic reversal. 
People v. Mitchell
, 189 Ill. 2d 312 (2000). We acknowledge that defendant’s claim, as originally pleaded, was predicated on cases such as 
Brandon
 and 
People v. Gevas
, 166 Ill. 2d 461 (1995), which predated 
Mitchell
. Indeed, defendant argues in his brief that the various changes in law that occurred in this court’s psychotropic-drug jurisprudence over the years prejudiced him because postconviction counsel was operating under the belief that defendant was entitled to an automatic reversal and, as a result, did not need to present any evidence in furtherance of the claim. We disagree.

At the time of the evidentiary hearing, it was clear from this court’s published opinions that the mere ingestion of psychotropic drugs while in jail awaiting trial was not enough to trigger an automatic reversal. In 
People v. Kinkead
, 168 Ill. 2d 394 (1995), we noted that the bare fact that a defendant was treated with psychotropic drugs while in jail does not, standing alone, warrant a new trial. In fact, we remanded the matter in 
Kinkead
 for an evidentiary hearing at which the circuit court was to “conduct an inquiry into the factual circumstances surrounding defendant’s asserted use of psychotropic medication while in prison.” 
Kinkead
, 168 Ill. 2d at 417. We noted that those circumstances included “the dates on which [the defendant] received and ingested such medicine and whether the psychotropic drug treatment [was] linked closely enough to the time of defendant’s plea of guilty and sentencing to have entitled him to a competency hearing pursuant to section 104–21(a).” 
Kinkead
, 168 Ill. 2d at 417. See also 
Britz
, 174 Ill. 2d at 196 (noting that no fitness hearing is required where there is no indication that defendant was being treated with psychotropic medication during the relevant times of the proceedings).

Defendant’s pleadings in this case did not identify when precisely defendant received and ingested the psychotropic drugs. As such, the circuit court correctly ordered a further factual inquiry into the circumstances of defendant’s ingestion of psychotropic drugs. For this reason, we cannot agree that the change of law cited by defendant on appeal unduly hampered the presentation of this claim–defendant’s allegations were sufficient to survive the State’s motion to dismiss, but under our case law at the time, defendant needed a further factual basis to achieve the “automatic” reversal for which he argued. The circuit court understood this and correctly undertook an inquiry into the factual circumstances surrounding defendant’s use of psychotropic medication while at the Bureau County jail. We have reviewed the testimony adduced at the hearing and conclude that the circuit court’s factual findings were not manifestly erroneous. In light of these circumstances, the circuit court did not err in denying defendant postconviction relief on the basis of this claim. Simply stated, the fact that the law changed while defendant’s appeal was pending is of no moment in this case because defendant’s claim would have failed even under our pre-
Mitchell
 case law.

Ineffective Assistance of Counsel: Guilty Plea Proceedings

 Defendant contends that he received ineffective assistance of counsel during the plea proceedings based on his counsel’s misapprehension of the law. In order to resolve this issue fully, we must set forth, in some detail, (i) defendant’s allegations concerning his attorney’s performance at the time the plea was entered, (ii) the evidence adduced at the evidentiary hearing, and (iii) the findings of fact made by the circuit court at the conclusion of the hearing.

As we noted previously, defendant’s postconviction petition, as amended, contained numerous claims of ineffective assistance of trial counsel. In his affidavit filed in support of his amended petition, defendant alleged that on the morning of June 11, 1992, Hedrich came to his jail cell at the Bureau County jail and told him that defendant was to plead guilty to both the murder and aggravated kidnapping charges that were pending against him. Defendant claimed that Hedrich told him that if defendant did not waive the jury, he “would get the death penalty.” Moreover, defendant contended that Hedrich told him that if defendant did waive the jury, he “would not get the death penalty” and that he would get “life in prison without parole and that ‘is better than death.’ ” Defendant claimed that Hedrich told him that both “J.D. Flood and Andrea Lyon told him to tell me that they wanted me to plead guilty.” Defendant alleged that he would not have pled guilty if Hedrich had not lied to him about Flood’s and Lyon’s positions on the guilty plea because defendant did not have “confidence” in Hedrich. Moreover, defendant claimed that Hedrich did not tell him that defendant could have a judge hear the case instead of a jury. Defendant further maintained that he told Hedrich that he wanted to testify in his own behalf at the hearing held on defendant’s motion to vacate.
(footnote: 3) The affidavit also contained an allegation from defendant in which he claimed that Hedrich told defendant that he (Hedrich) was intimidated by the State’s Attorney.

In rejecting the State’s motion to dismiss, the circuit court noted that an evidentiary hearing was necessary with respect to defendant’s claims concerning Hedrich’s alleged lies to defendant prior to the entry of the guilty plea and Hedrich’s alleged conflict of interest. The circuit court also wanted to conduct an inquiry into defendant’s allegations that Hedrich mishandled defendant’s motion to vacate.

Defendant called various witnesses at the hearing. J.D. Flood, the Grundy County public defender, testified that in early January 1992 he was appointed to defendant’s case as co-counsel to defendant’s then-attorney, Bureau County Public Defender Matthew Maloney. Prior to that time, Flood had taken part in approximately 10 felony trials, 5 as first chair, and 5 as second chair. Flood spoke to defendant only once or twice before defendant entered his plea of guilty, mainly to get to know defendant and to discuss the circumstances of defendant’s case with respect to the jurisdictional motion that the defense was preparing. Flood never discussed with defendant the option of pleading guilty to the charges, and defendant never solicited his views on the matter. Flood believed that the State had a strong case against defendant and felt that the defense’s best chance for success in the case rested with the jurisdictional motion, because “the State of Iowa does not have a death penalty.”

In Flood’s view, Hedrich’s advice to have defendant enter into a blind guilty plea was not good advice because the State was seeking the death penalty. According to Flood, after the June 11, 1992, guilty plea, Flood “took the initiative and started preparing [the motion to vacate] immediately without any consultation or direction from defendant.” At no point in the case did defendant ever tell Flood that defendant had changed his mind regarding the guilty plea. Flood testified that it was he and not Hedrich who had prepared defendant’s motion to vacate the guilty plea. Defendant never mentioned to Flood that Hedrich told him that Andrea Lyon was in agreement with the decision to plead guilty. Flood stated that at the time he prepared the motion, he was unaware that defendant had been advised by Hedrich that Flood had concurred in the decision to plead guilty. Had Flood been aware of that fact, he would have included it in the motion as a another ground for vacating the plea. Defendant never complained to Flood about any lies that Hedrich may have told him during the discussion leading up to the guilty plea.

Flood further testified that he advised defendant that he would not be calling defendant to testify at the motion to vacate. Flood believed that it would be inappropriate for defendant to take the stand because he did not want to subject defendant to cross-examination. Flood stated that Hedrich had “no say” on the motion to vacate or how it was litigated. Flood did not consider calling Hedrich as a witness at the hearing on the motion to vacate because he believed that Lyon’s testimony, in conjunction with Hedrich’s sworn affidavit, would be “enough to cause Judge Hupp” to vacate the plea.

John Hedrich also testified at the hearing. Hedrich, who has been a licensed attorney since 1955, was appointed Bureau County public defender by the circuit court after the former public defender, Matthew Maloney, resigned the office in January 1992. Hedrich, who had been an assistant State’s Attorney in the mid-1960s, admitted that he lacked felony experience and had litigated mostly misdemeanors and civil matters while at the State’s Attorney’s office. Indeed, Hedrich conceded that he did not feel qualified to represent a capital litigant because he lacked experience in the area. As a result, he attended seminars concerning death penalty litigation sponsored by the Capital Resource Center. Through these seminars he met Andrea Lyon, whom Hedrich considered an expert in capital litigation.

Hedrich testified regarding his views on defendant’s defense. According to Hedrich, the State had assembled a strong case of defendant’s guilt. Defendant’s statements to police had been accompanied by 
Miranda
 warnings, and defendant never complained of any police misconduct or coercion in their taking of the statements. The statements were corroborated by both physical and forensic evidence. Early in the course of Hedrich’s representation, defendant told him that a satanic cult had been involved in the crimes. Hedrich investigated defendant’s allegations, but could not find any evidence to support the claim. With respect to Hedrich’s own thoughts regarding defense strategy, Hedrich considered the jurisdictional challenge to the murder charge to be the strongest legal argument and defense that defendant had against the charges. Hedrich believed that the State possessed overwhelming evidence of defendant’s guilt and that there was no realistic chance of an acquittal if the case went to trial. In fact, after discussing matters with J.D. Flood and Andrea Lyon, Hedrich felt that the case revolved around two issues–the jurisdictional question and, if that proved unsuccessful, the defense’s attempt to save defendant’s life at the sentencing stage of the proceedings.
(footnote: 4)
 Hedrich testified that, prior to June 11, 1992, he had met with the State’s Attorney, Marc Bernabei, and had discussed the possibility of a plea. Hedrich told defendant that Bernabei would not agree to any sentence other than death in the case. During his discussion with defendant concerning the entry of the guilty plea, defendant never asked Hedrich what either Andrea Lyon or J.D. Flood thought of the strategy. Hedrich denied telling defendant that Flood and Lyon told him to tell defendant that they wanted defendant to plead guilty. On June 16, 1992, Hedrich met with Andrea Lyon and told her about the guilty plea. Lyon advised Hedrich that the guilty plea was ill-advised because by pleading guilty defendant had nothing left to bargain with and that the plea waived arguments such as jurisdiction. Based on Lyon’s opinion, Hedrich decided that defendant should move to vacate the plea, and he put Flood in charge of preparing the motion. Defendant’s motion to vacate was subsequently filed on June 22, 1992.

Hedrich testified about an altercation that occurred between him and Bernabei on June 28, 1992, in Judge Wampler’s chambers. At the time, Bernabei “unloaded” a torrent of “abusive language” on Hedrich regarding the motion to vacate. According to Hedrich, Bernabei “got up out of his chair, came over and grabbed me by the muscles, upper muscles in both arms and shook me and shouted at me.” Hedrich was shocked by Bernabei’s conduct and was angered by the unprofessionalism of his conduct. Hedrich did not feel threatened by the incident or by Bernabei, but did feel angry. As a result of the encounter, Hedrich determined to maintain a physical distance from Bernabei so that he would not “get shaken again.”

During his direct examination, Hedrich was asked to explain why he advised defendant to plead guilty. The following was the first colloquy on the subject:

“Q. Okay. Can you please tell Judge Lanuti why you told [defendant] you were going to plead guilty. Tell Judge Lanuti your reason for that?

A. Well, yes, we were going to have a jury in and they were going, if we tried it, they were going to go through the whole thing and then if they found him guilty, which was pretty certain, then they were going to have another hearing to decide on the punishment and I said, well, it would be better that they don’t hear all this twice, it’s better they hear it once.

Q. Did you know that you could have had a bench trial hear the case in chief and if there was a guilty you could have had the jury then impaneled, as was impaneled, to hear the aggravation and mitigation and the death qualified stage? Did you know that at the time?

A. No, I didn’t think of it, I didn’t discuss it, I didn’t discuss it.”

Hedrich further stated that he and Flood discussed at length whether it would be better for a jury or the trial judge, Judge Hupp, to decide death eligibility and aggravation/mitigation. According to Hedrich, Flood was more familiar with Judge Hupp and Flood felt that “we better do aggravation and mitigation before the jury rather than” Judge Hupp. Hedrich’s testimony was interrupted at this point to accommodate the schedule of another testifying witness. When Hedrich returned to the stand, the matter was broached again:

“Q. Thank you. Can you tell me, sir, I’m trying to pick up where we left off, can you tell Judge Lanuti why you plead [defendant] guilty?

A. Well, it appeared that there wasn’t any sense in the trial and he was going to be found guilty anyway and I didn’t think there was any sense in going through it twice in front of a jury who is going to, I guess by that time we determined that the jury was going to hear the aggravation and mitigation.”

Hedrich also stated that he advised the guilty plea because it allowed the defense more time to prepare in mitigation. He also considered the move to be an attempt to get the jury to do something other than impose the death penalty.

Defendant also testified in his own behalf at the hearing. Defendant stated that he was more comfortable with Flood and Andrea Lyon than he was with Hedrich because Hedrich had told defendant that he did not know what he was doing. According to defendant, Hedrich told him that, if defendant pleaded guilty, he would not receive the death penalty. Defendant believed that a “deal” had been reached between Hedrich and the State. Defendant further testified that when Hedrich advised him to plead guilty, defendant specifically asked him what Flood’s and Lyon’s positions were on the matter and that Hedrich told him that both of them had agreed to it. Although defendant had never met Lyon, he testified that he put “high importance” on her opinion. Defendant would not have pleaded guilty if he had known that Flood and Lyon were against it.

Defendant maintained during the course of his testimony that he did not understand the ramifications of his decision to plead guilty when he did so in open court on June 11, 1992. Although defendant acknowledged that he had told Judge Hupp in open court that he understood the consequences of pleading guilty and that he was doing so voluntarily, defendant testified that he had not been truthful in those responses. This was so, defendant explained, because Hedrich had previously instructed defendant as to what he was to say and do when Judge Hupp addressed him. According to defendant, Hedrich instructed defendant that defendant was to tell the judge “yes sir” when Hedrich “shook his head yes” and that defendant was to tell the judge “no” when Hedrich shook his head “no.” Defendant stated that as a result of these instructions, he did not truly understand any of the consequences of entering a plea of guilty in open court.

Defendant testified that after he had pleaded guilty, he spoke with both Flood and Lyon and they told him that they did not agree with the decision to plead guilty. Defendant also maintained that he told Hedrich that he wanted to testify at the motion to vacate because he wanted to “explain” why he told jailers James Reed and Tim Wren that he did not want to withdraw his guilty plea. According to defendant’s postconviction testimony, defendant did, in fact, tell both men that he did not want to withdraw his plea. However, defendant stated that he had lied to them in attempt to curry favor with them.

On cross-examination, defendant acknowledged that when he pled guilty before Judge Hupp, he understood that he was giving up his right to have a trial, but that he nonetheless lied to the judge during the plea proceeding because defendant answered all of the judge’s questions in the manner in which Hedrich coached him. Hedrich would communicate to defendant “with either a nod yes or a nod no” while he, Hedrich, and Bernabei were standing in front of the judge’s bench. Defendant acknowledged that his plea of guilty in this case was not the first time he had pleaded guilty to charges before a judge. Defendant claimed, however, that in the prior case, just as in the present case, his lawyer had “instructed” him in the same manner that Hedrich had. Defendant further acknowledged that he was in the courtroom on the occasions when the prosecutor announced that the State would be seeking the death penalty in the case. Defendant was aware that the State’s Attorney would not be making any deal with the defense in which defendant would receive a sentence other than death. Defendant admitted that he told Hedrich that a satanic cult was responsible for the victim’s death and also told police the same story while he was in custody in the Bureau County jail, but that the story was not true. Defendant testified that he informed Flood that Hedrich had told defendant that Flood also wanted defendant to plead guilty. Defendant, when he pleaded guilty on June 11, 1992, knew that he was facing a trial date of June 22, 1992, and that it was a “matter of record” that the circuit court would not allow another delay unless “something” happened. Defendant discussed the evidence against him with his attorneys and with the investigator assigned to assist in the case. Defendant admitted that he knew what the evidence was that the State would use against him and knew that the State had a strong case against him.

At the conclusion of the hearing, the circuit court made a lengthy ruling on the contentions raised by defendant. The court first resolved defendant’s claim regarding Hedrich’s alleged conflict of interest. The court found that an altercation had taken place between Hedrich and Bernabei in one of the judge’s chambers in the courthouse. The circuit court ruled that although Hedrich had concerns regarding Bernabei’s stability as a result of this episode, there was no credible evidence that the altercation affected Hedrich’s handling of defendant’s case. Indeed, the court concluded that the record showed that defendant’s motion to vacate, which had been the cause of the altercation, had been litigated fully the very next day. Moreover, the evidence revealed that the motion was prepared by attorney Flood and was litigated solely by him so that Hedrich was not involved in the handling of the motion and, as such, Hedrich was not in a position to affect litigation of the motion because of any “intimidation.” The circuit court, accordingly, ruled that the evidence presented by defendant failed to show that the altercation had any prejudicial effect on the proceedings.

The circuit court then addressed defendant’s remaining claims and noted that it considered the credibility of each of the witnesses who had testified. The court specifically stated that it did not consider defendant’s status as a petitioner “with a motive” in its assessment of credibility. In other words, the court did not find defendant less credible simply because of his status as a defendant. With respect to defendant’s claim that he requested to testify at the hearing on the motion to vacate, the court found that defendant’s testimony was at odds with defendant’s sworn affidavits. Specifically, the circuit court noted the following:

“Now in his affidavit and testimony, the defendant has indicated that he requested to testify during the motion to vacate his guilty plea. There is a conflict, however, between his affidavits. In the first affidavit filed with his 
pro se
 motion to vacate the guilty plea [
sic
], he indicated that he requested to testify during the final arguments of the prosecutor.
(footnote: 5) In his subsequent affidavit filed in his amended postconviction petition, the defendant inferred that his request to testify was during the actual testimony of James Reed and Troy Wren. In his affidavit, the defendant indicated that he told Attorney Hedrich that he wanted to testify. That he’d testify Reed and Wren were lying and that he had never made statements to them that he did not want to withdraw his guilty plea. Now, at the hearing before this Court, the defendant has admitted that this affidavit is false. He now states that he did make a statement to Reed and Wren but the reason he wanted to testify was to explain them to the judge. Now, beginning with the obvious fact that the defendant’s admission of a false affidavit casts doubts on credibility, it also raises the following issues. First, J.D. Flood testified he was running the hearing on the motion to vacate. Why would not the defendant ask Flood if he wanted to testify instead of directing his comments to Hedrich? Flood does not recall any such request from the defendant. The Court also does not find that the seating arrangement at counsel table presented any obstacle to the defendant’s speaking to Flood.

Also, Flood testified it was his decision not to call [defendant] to the stand because he did not want the State’s Attorney to have an opportunity to cross-examine him.

* * *

And finally, was it ineffective not to have the defendant testify at this hearing? He would have gotten on the stand and verified that the State’s witnesses were telling the truth and he had made such a statement. He would then had [
sic
] to tell the Court that he was lying to the State’s witnesses when he made the statement. He would have then had to argue to the judge to believe that his earlier statements had been a lie but his testimony now is the truth. Would this likely have changed the results of the motion to vacate the guilty plea even if such a request was made?

The Court finds as follows: Court finds that there was never a demand to testify made. There may have been some discussion but the defendant never made an outright demand to either lawyer to testify.

Second, it was not ineffective not to call the defendant to the stand since he would have corroborated the State’s witnesses and admitted his own lies.”

In making these rulings, the circuit court specifically found Hedrich to be a credible witness, who was “willing to admit to his own shortcomings, perhaps too readily.” The court further found that Hedrich was “willing to admit if he doesn’t recall specific details of conversations.” The court found it “interesting” that “these are the precise areas where [defendant] is attempting to fill in the gaps and claim ineffective assistance of counsel.” The court concluded that there was no evidence that defendant was in any way prevented from testifying at the hearing and that, in sum, defendant failed to prove facts that demonstrated a constitutional violation stemming from defendant’s not testifying at the hearing on the motion to vacate.

The circuit court next addressed defendant’s claims that defendant received ineffective assistance of counsel with respect to the entry of the guilty plea because of Hedrich’s alleged lies to defendant. The court noted that the basis of defendant’s claim was the misrepresentation Hedrich allegedly made to defendant concerning the position of J.D. Flood and Andrea Lyon on the guilty plea. The circuit court made the following findings in this respect:

“Now, Attorney John Hedrich has not admitted any misrepresentation but has testified that he discussed the guilty plea with Flood. He also testified that he advised the defendant to plead guilty. Hedrich did not recall the defendant initiating any inquiry about Flood or Lyon’s position which is in contradiction to the defendant’s testimony. Hedrich also felt the defendant pled guilty knowingly, although he doesn’t specifically recall the entire conversation. Hedrich denied the specific allegation in paragraph one of the defendant’s affidavit attached to the amended post-conviction petition.

Now, in his petition for post-conviction relief and his amended petitions, the defendant at no time made any claim that he failed to understand the admonitions and conversation that he was having with Judge Hupp at the time of the plea of guilty. Rather, his position was that since misrepresentations had been made behind the scenes, that his plea was in a sense involuntary. Now at this hearing, however, the defendant has decided to have his cake and eat it, too. Not only is he claiming that misrepresentations induced him to plead guilty, he now testifies he didn’t understand anything that was going on during the plea of guilty.

Now, in their written closing arguments the State has gone in [
sic
] detail through the guilty plea that took place in open court. The plea contains numerous statements by the defendant in which he indicated to the Court he understood the nature of the charges, his rights involved, the possible penalties, and that no promise or threats had been made in order for him to plead guilty. As was pointed out in the defendant’s cross-examination, the defendant did not simply answer yes or no. At times he even pointed out to the Court and to counsel areas that had already been covered. The defendant would have this Court believe that he understood none of these matters and was simply mimicking signals he was receiving from his attorney. Not only has his attorney denied that, it is ludicrous for this Court to believe that a trial judge on a plea of this length and detail would not recognize signals going back and forth between an attorney and a defendant who were standing within inches of him in front of the bench. *** The defendant’s testimony that he did not understand the proceedings in open court on the day of the plea and that he was being given signals from his attorney and that he had been promised a life sentence in return for a plea of guilty simply are not credible. They are totally contradicted by the record of the plea and by the testimony of Mr. Hedrich.

The redirect testimony of the defendant, which I will not repeat in detail, should be illuminating for any court reviewing this matter. The defendant was asked a series of leading questions which helped his position. He willingly and quickly responded in the affirmative to them. On the other hand, when the defendant was confronted with the more difficult questions on cross-examination by the State’s Attorney, he was more evasive, deliberate, and inconsistent in his answers. It was clear to this Court in observing defendant’s demeanor and manner in answering questions that the defendant is certainly able to understand the proceedings that are going on and the issues before this Court. ***

It is hard for this Court to believe that the defendant did not understand what was going on in open court on June 11, 1992. The defendant understood he was pleading guilty. He understood he was confronted with strong evidence. He understood the possible penalties involved and made a decision to plead guilty. The defendant is simply lying when he testifies that he did not understand the court proceedings on June 11. If his post-conviction petition affidavits are true, the defendant wanted to plead guilty and understood he was pleading guilty, but doing it based on a misrepresentation. That has been totally contradicted by his testimony at this hearing where he now says he didn’t understand the proceedings at all. It appears to the Court that he was making up his testimony as he went along.

Now, returning to the original claim that certain misrepresentations regarding the position of Flood and Lyon were made to him prior to the guilty plea, as this Court has previously stated, the defendant has the burden of proving that this took place. Hedrich does not recall any such conversation. The only other person to the conversation was the defendant. This Court, however, has already determined that the defendant’s testimony is not to be believed on the issue of the guilty plea and the defendant has already admitted to lying on his affidavit that he filed in the post-conviction petition. The defendant, accordingly, is not a credible witness. The Court does not have to accept his testimony simply because no one else has contradicted it.”

The court went on to note that defendant’s testimony regarding Hedrich’s alleged lies was further contradicted by the fact that defendant never made any attempt to raise the misrepresentations sooner, despite the fact that defendant presented issues regarding the motion to vacate the guilty plea centering on Andrea Lyon in later motions filed in a postsentencing motion. The court found that defendant failed to prove that any misrepresentations were made to him. Moreover, the court concluded that defendant failed to prove that any misrepresentations made to him were the basis of his guilty plea. The court found defendant’s plea was voluntarily made with complete understanding of the “what the possible penalties were and what his rights were.”

It is against the foregoing factual backdrop that we address defendant’s claim of ineffective assistance of counsel with respect to his guilty plea. Defendant makes no attempt in this court to specifically challenge the majority of the circuit court’s findings from the evidentiary hearing, 
i.e.
, (i) that Hedrich lied to him regarding Flood’s and Lyons’ positions on the guilty plea, (ii) that defendant told Hedrich he wanted to testify at the motion to vacate, and (iii) that Hedrich labored under a conflict of interest. Rather, defendant contends that his convictions must be reversed and the cause remanded for a new trial because, as a result of Hedrich’s legal misapprehension, Hedrich failed to explain to defendant that the law allowed him to have the trial judge hear the guilt phase of the trial instead of a jury. Defendant argues Hedrich provided ineffective assistance of counsel because Hedrich’s “goal”–to avoid having the jury hear the evidence “twice”–could have been achieved without defendant’s giving up his right to trial.

At the outset, we note that defendant urges this court to first examine Hedrich’s utter lack of qualifications and experience and his “repeated acts of incompetence” before we examine specifically the improper advice Hedrich gave to defendant during the plea discussions. According to defendant, these other considerations will impact our resolution of the claim. We acknowledge that Hedrich admitted  to having had no experience in capital litigation. Defendant points to Hedrich’s lack of qualifications and notes that the trial judge recognized this fact by appointing Flood to assist Hedrich. Defendant’s assertion is incorrect, however, because the record affirmatively establishes that the circuit court appointed Flood co-counsel in this case 
before
 Hedrich was even appointed. Flood was appointed to serve as co-counsel to Hedrich’s predecessor, Matthew Maloney. Therefore, we disagree with defendant’s intimation that Flood was appointed as compensation for Hedrich’s shortcomings. Moreover, we will not consider the “repeated acts of incompetence” that defendant claims Hedrich allegedly committed that do not relate to the plea discussions Hedrich had with defendant and that have no bearing on whether defendant’s plea was entered into knowingly and intelligently. Instead, we focus on the argument that defendant has raised in this appeal, namely, whether the mistaken advice constitutes ineffective assistance of counsel such that reversal is required.

Challenges to guilty pleas which allege ineffective assistance of counsel are subject to the standard set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). 
Hill v. Lockhart
, 474 U.S. 52, 57, 88 L. Ed. 2d 203, 209, 106 S. Ct. 366, 369-70 (1985);
 People v. Huante
, 143 Ill. 2d 61, 67 (1991). Counsel’s conduct is deficient under 
Strickland
 if the attorney failed to ensure that the defendant entered the plea voluntarily and intelligently. 
Huante
, 143 Ill. 2d at 69. To establish prejudice, a defendant must show that there is a “reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” 
Hill
, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370.

With respect to the first 
Strickland
 prong, we will assume for purposes of this appeal that Hedrich was deficient in not realizing that the option existed for a bench trial during the guilt/innocence phase of the proceedings. We note, however, that defendant’s postconviction testimony reveals that when defendant was asked whether he understood that the right to trial included both the right to have either a judge or a jury hear the case, his answers varied. In some instances, defendant responded that he did not understand that, but in other instances he responded that he did. In this respect, we agree with the circuit court’s ruling that the defendant’s testimony was oftentimes “evasive” and “inconsistent.” Therefore, it could be said that regardless of Hedrich’s legal misapprehension, defendant did indeed know of the right to have a judge decide the guilt phase and his plea was knowingly made. However, because the testimony is equivocal, we will give defendant the benefit of the doubt and will assume that defendant did not know he could have chosen to have a judge determine his guilt. Therefore, we turn to whether defendant was prejudiced by the Hedrich’s legal mistake. In other words, we must determine whether there is a “reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” 
Hill
, 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370.

Courts have stressed that the prejudice prong of the 
Hill-Strickland
 test may pose a difficulty in some cases because it is by no means obvious how a court is to determine the probability that a defendant would have gone to trial. The United States Supreme Court noted that a showing that the ineffective performance affected the outcome of the plea process is required. See 
Hill
, 474 U.S. at 59-60, 88 L. Ed. 2d at 210-11, 106 S. Ct. at 370-71. However, a bare allegation that had counsel not been deficient during plea discussions, defendant “would have pleaded differently and gone to trial” is not enough to establish prejudice. 
Key v. United States
, 806 F.2d 133, 139 (7th Cir. 1986); accord 
Huante
, 143 Ill. 2d at 73; 
Gargano v. United States
, 852 F.2d 886, 891 (7th Cir. 1988).

Hedrich admitted to his erroneous legal interpretation during his testimony, which was heard in open court on December 5, 1996. Defendant testified on his own behalf on December 6, 1996. Despite the fact that Hedrich’s mistaken advice was a matter of record, defendant never stated in his testimony that, had Hedrich correctly advised him about his right to have a judge hear the evidence during the guilt phase of the proceedings, defendant would not have pleaded guilty and would have instead insisted on going to trial, regardless of what other additional considerations might have motivated him to plead guilty. Indeed, at no point in his testimony did defendant assert or intimate anything that would support such a conclusion. Rather, defendant stated under oath that he put “no importance on the opinion or advice of Hedrich.”

Notwithstanding the above, defendant argues on appeal that he was prejudiced because he would not have pleaded guilty had he known that he could have had a judge determine his guilt at a bench trial and still have had a jury decide sentencing. As we have pointed out, however, a defendant alleging ineffective assistance of counsel during plea proceedings must still establish prejudice. The bare allegation that, but for the mistaken advice, a defendant would have insisted on trial, without something more, is not enough. Standing alone, such an allegation is “subjective, self-serving, and *** insufficient to satisfy the 
Strickland
 requirement for prejudice.” 
Turner v. Tennessee
, 858 F.2d 1201, 1206 (6th Cir. 1988), 
vacated on other grounds
, 492 U.S. 902, 106 L. Ed. 2d 559, 109 S. Ct. 3208 (1989). As the Court of Appeals for the First Circuit has noted,

“[Appellant’s] self-serving statements that, but for his counsel’s inadequate advice he would have pleaded not guilty, 
unaccompanied by either a claim of innocence or the articulation of any plausible defense that he could have raised had he opted for a trial
, is insufficient to demonstrate the required prejudice.” (Emphasis added.) 
United States v. LaBonte
, 70 F.3d 1396, 1413 (1st Cir. 1995), 
rev’d on other grounds
, 520 U.S. 751, 137 L. Ed. 2d 1001, 117 S. Ct. 1673 (1997).

We believe that the same conclusion obtains in this case. Defendant does not now allege that he is innocent, nor does he claim to have any plausible defense that he could have raised had he chosen a bench trial. At oral argument defense counsel maintained that the entry of the guilty plea precluded defendant from investigating a viable defense with respect to defendant’s sanity. However, at no point in these postconviction proceedings has defendant sought to establish what such an investigation would have produced. Our review of the total record in this case convinces us that this is not a case in which psychiatric and psychological evidence was totally lacking. As we detailed previously, several mental health practitioners testified upon defendant’s behalf at the sentencing hearing. This testimony should have served as the basis for further exploration by postconviction counsel of any potentially viable insanity defense that was precluded by Hedrich’s improper guilty plea advice. 
Indeed, at oral argument the following question was asked of counsel: “During the time since the plea, has there been any evidence unearthered that would have suggested in any way that there would have been an insanity defense?” Counsel replied in the negative. We further note that during the plea proceedings, defendant admitted to kidnapping Kahla and driving her across state lines where he sexually assaulted and ultimately strangled her, and he has never repudiated those sworn admissions. Thus, defendant “ ‘does not maintain ... that he is innocent of the charges in the indictment, or that a plausible defense to those charges exist[s].’ ” 
Czere v. Butler
, 833 F.2d 59, 64 (5th Cir. 1987), quoting 
United States v. Sutton
, 794 F.2d 1415, 1422 (9th Cir. 1986). Given these facts, defendant has not established the prejudice required under 
Strickland
.

We have carefully reviewed all of the transcripts in this case, from both the original trial and subsequent postconviction proceedings. Defendant was apprised of his constitutional rights and the range of sentences that he faced upon conviction for each of the crimes with which he was charged in several court appearances in addition to the guilty plea proceeding. The State made clear its intent to seek the death penalty from its earliest court appearances. Defendant’s own postconviction testimony supports the conclusion that defendant was aware of all of this when he entered into his plea.

Our review of the record also convinces us that defendant was not as passive a participant in the proceedings, as he would now have this court believe. On the contrary, defendant had the wherewithal to take the initiative and look out for his own interests, as his December 9, 1991, letter to the trial judge complaining about his appointed counsel (Maloney, at that time) clearly demonstrates. The record further shows that defendant is not beneath lying to police and his own legal representatives–his claim of the involvement of a satanic cult in the crimes at issue and his subsequent testimony that this was a lie stands as a testament to that fact, as does his admission that he lied to jailers in an attempt to curry favor. Our review of the plea proceedings indicates that defendant was paying attention to Judge Hupp and was following the plea proceedings independent of any “coaching” from Hedrich. Defendant’s unsolicited responses and interaction with the judge are evidence of that fact, notwithstanding defendant’s postconviction assertion that he was merely mimicking signals given to him from Hedrich. We also point out that the testimony from the defendant’s jailers and guards provided yet another perspective into defendant’s demeanor and awareness. Each one indicated that defendant talked about the proceedings with him in a manner that indicated to him that defendant understood the nature of the charges against him and the proceedings he was facing.

Finally, we cannot ignore the varying and, at times, somewhat inconsistent positions that defendant has taken during the course of these postconviction proceedings. In his postconviction pleadings, defendant alleged simply that Hedrich had lied to him regarding Flood’s and Lyon’s concurrences in the decision to plead guilty and, in light of that fact, his guilty plea was in essence involuntary. During his testimony at the postconviction evidentiary hearing, defendant maintained that he put “no importance on the opinion or advice of Hedrich” and that the single element which led him to plead guilty was the fact that Hedrich told him that Flood and Lyon wanted him to do so. Now, in this appeal, defendant drops all reference to the purported lies Hedrich told him during their plea discussions and instead focuses on the fact that he was misadvised by Hedrich during those discussions. We note that to grant defendant a new trial in this case would require this court to conclude that defendant relied upon advice from a lawyer whom defendant swore under oath not to have relied upon. Defendant’s frequent changes of position, as evinced in this record, are damaging to the credibility of his claims and cannot be disregarded. Defendant’s story changes to suit the exigencies of the moment.

In light of all of these facts, we disagree with defendant that “great doubt” exists about whether defendant knowingly pleaded guilty, notwithstanding Hedrich’s mistaken belief regarding the availability of a bench trial during the guilt phase of the trial. After considering the record in its entirety, including all of the testimony adduced at the postconviction evidentiary hearing, we agree with the circuit court’s finding that defendant entered into the plea in order to use his admission of guilt to gain leniency from the sentencing jury. Thus, we are satisfied that defendant entered his plea knowingly and intelligently, such that our confidence in the outcome is not “undermined.” See 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Sentencing Issues

 As we noted earlier in this opinion, defendant raises several issues concerning the sentencing phase of his trial. We believe that these issues have been rendered moot by the Governor’s commutation. An appellate issue is moot when it is abstract or presents no controversy. 
People v. Blaylock
, 202 Ill. 2d 319, 325 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. 
People v. Jackson
, 199 Ill. 2d 286, 294 (2002). Commutation removes a judicially imposed sentence and replaces it with a lesser, executively imposed sentence. 
People ex rel. Johnson v. Murphy
, 257 Ill. 564, 566 (1913); see Black’s Law Dictionary 274 (7th ed. 1999). Therefore, the commutation rendered defendant’s sentencing issues moot. See, 
e.g.
, 
Lewis v. Commonwealth
, 218 Va. 31, 38, 235 S. E.2d 320, 325 (1977); 
State v. Mitchell
, 239 Or. 87, 88, 396 P.2d 572, 573 (1964).

CONCLUSION

The circuit court’s judgment denying defendant postconviction relief is affirmed.

Affirmed.

JUSTICE RARICK, dissenting: 

I respectfully dissent from the opinion of the court because I believe the instant appeal should have been dismissed pursuant to defendant’s motion to dismiss. This court has stated:

“ ‘By numerous decisions this court has held that no right is more clearly established than that of an appellant to dismiss his appeal, regardless of the protest of the appellee. [Citations.] The appellant in an appeal *** may always dismiss the appeal *** before a decision on the merits, and the effect of such dismissal is to leave the parties where they were before the appeal was taken ***.” 
People ex rel. Waite v. Bristow
, 391 Ill. 101, 111 (1945), quoting 
First National Bank of Kewanee v. Union State Savings Bank & Trust Co.
, 350 Ill. 21, 22 (1932). 

Accord 
Safeway Insurance Co. v. American Arbitration Ass’n
, 247 Ill. App. 3d 355, 358-59 (1993). 

In
 
this case, defendant moved for dismissal of the appeal after the Governor commuted his death sentence to natural life imprisonment
. The State did not object to defendant’s motion to dismiss because, from the State’s perspective, there was no point in doing so: dismissal would have left defendant’s convictions for aggravated kidnapping and murder intact, as well as respective sentences of 15 years and natural life. It makes no sense for this court to deny defendant’s motion to dismiss his appeal so that it can issue an opinion that leaves him in the same position he would have been in had the appeal been dismissed pursuant to his request. In its current procedural posture, this appeal presents no actual controversy and this court’s decision is nothing more than an advisory opinion. See 
People ex rel. Partee v. Murphy
, 133 Ill. 2d 402, 408 (1990). Under the circumstances, an opinion from this court is simply unnecessary.

JUSTICE KILBRIDE joins in this dissent.

FOOTNOTES
1:     
1
Spring Valley is located in Bureau County.

2:     
2
The record reveals that the circuit court did not deny the motion. Rather, the court ruled that a previous order, entered in December 1991 and which allowed defendant to retain a psychiatrist, Dr. Rossiter, covered defense counsel’s request. We further note that the circuit court, in an order entered on February 26, 1992, granted defendant’s motion for psychological testing to be done in conjunction with the appointment of Dr. Rossiter.

3:     
3
Both the original 
pro se
 petition and the amended petition contained claims regarding defendant’s desire to testify at the hearing held on the motion to vacate the guilty plea. In the affidavit defendant filed with the 
pro se
 petition, defendant swore, “[C]ounsel never informed me that I had a right to testify at the hearing on the motion to withdraw my guilty plea. When the prosecutor argued to the judge that I had not testified on the motion *** I requested that Attorney Hedrick [
sic
] permit me to take the stand to testify. Mr. Hedrick refused that request.” In the affidavit that supported defendant’s amended petition, defendant swore that he told Hedrich to let him testify that he wanted to withdraw his guilty plea. Defendant further swore that “during the Motion to Withdraw my guilty plea, when James Reed and Troy Wren testified that I had told them that I did not want to withdraw my plea of guilty, I again told John Hedrich in court that I wanted to testify that I never said that, but he told me that I could not testify. Only Andrea Lyon could testify for me.”

4:     
4
Hedrich’s postconviction recollection is corroborated by the testimony of Andrea Lyon, taken some four years earlier at the hearing held on defendant’s motion to vacate his guilty plea–Lyon testified that she felt that the focus of defense efforts should have been on the fact that defendant should have been prosecuted in the jurisdiction where the death occurred, 
i.e.
, Iowa, and on mitigation “given what he [Hedrich] told me about the nature of the evidence.”

5:     
5
The circuit court incorrectly referred to this affidavit as being filed with defendant’s motion to vacate the guilty plea. This could not be possible, of course, because that motion was filed several days 
before
 the hearing in question. The circuit court here was referring to the affidavit filed in support of his 
pro se
 petition for postconviction relief, where defendant first raised the matter.