2025 IL App (1st) 230321-U

SECOND DIVISION
June 3, 2025

No. 1-23-0321

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 11CR10429 |
| | ) | |
| ANTONIO BUCIO, | ) | Honorable |
| | ) | Laura Ayala-Gonzalez, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Second stage dismissal of defendant's postconviction petition affirmed where defendant's claims were waived by his guilty plea, and where defendant failed to make a substantial showing that his plea counsel was ineffective.

¶ 2    Defendant, Antonio Bucio, entered a guilty plea to one count of attempted murder in connection with a 2011 gang related shooting in Chicago. In this appeal, defendant challenges the trial court's second stage dismissal of his postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), contending that he made a substantial

showing that his trial counsel provided ineffective assistance, and that he presented "new evidence of police misconduct" relating to his inculpatory statement.

¶ 3    The record shows that on June 8, 2011, two children were shot Avondale Park in Chicago, before the gunman fled the scene. The next day, defendant was arrested. Defendant was taken to the Area 5 police station, where he acknowledged responsibility and signed an inculpatory statement.

¶ 4    On July 6, 2011, defendant was charged by indictment with 13 counts of attempted murder, two counts of aggravated battery with a firearm, one count of aggravated battery of a child with a firearm, and two counts of aggravated discharge of a firearm.

¶ 5    Thereafter, on September 27, 2013, defendant filed a motion to supress his confession, alleging that it was the product of police coercion. Defendant stated, among other things, that "during the arrest of the defendant[,] Chicago police officers physically assaulted the defendant and threaten to continue to physically assault him unless he made an inculpatory statement."

¶ 6    The court held a hearing on the motion on December 16, 2013. Detective Anthony Noradin testified that he was assigned to investigate the June 8, 2011, shooting. On June 9, 2011, around 3 p.m., defendant was placed in a locked interview room at the area 5 police station. Detective Noradin and his partner, Detective Graham, met with defendant at that time. Detective Noradin testified that Detective Graham informed defendant of his *Miranda* rights, and defendant verbally indicated that he understood and waived those rights.

¶ 7    Detective Noradin testified that the first interview with defendant lasted approximately 45 minutes to an hour, and defendant initially denied being involved in the shooting. Detective Noradin then informed defendant that he had been "identified by witnesses at the scene as being

the person who fired the handgun." Defendant then "admitted his participation in the shooting" roughly 15 minutes into the interview.

¶ 8     A few hours later, at approximately 7 pm, Detective Noradin met with defendant again, this time with Assistant State's Attorney (ASA) Melanie Fialkowski. Defendant was advised of his *Miranda* rights by ASA Fialkowski, and defendant stated that he understood and waived those rights. Detective Noradin and ASA Fialkowski spoke to defendant for about 20 minutes, and defendant gave a statement "consistent with the first statement."

¶ 9     Finally, around 9:45 p.m., Detective Noradin and ASA Fialkowski met with defendant to "memorialize the statement." Defendant agreed to give a written statement. ASA Fialkowski typed the statement, and defendant reviewed the statement, reading the first page aloud, and "follow[ing] along through the remainder of statement with [ASA] Fialkowski."

¶ 10     Defendant's written statement acknowledged that he had been advised of his *Miranda* rights, that he understood them, and that he wished to waive them. The statement further indicated that defendant "ha[d] been treated well by the detectives and ASA Fialkowski," and that "no threats or promises ha[d] been made to him to make the statement." Defendant had been "given pizza to eat, [and] water and pop to drink," he was "allowed to use the bathroom when necessary" and he was "not handcuffed at any time when he spoke with ASA Fialkowski." Defendant then stated that he was a "member of the Maniac Latin Disciples street gang," and that

> "when he heard what happened, he felt really bad and sorry about it. [Defendant] stated he feels terrible that the two little girls got hurt and that he knows he did something bad and is ready to take his time. [Defendant] states he never meant to hurt the little girls that got hurt and he is sorry."

¶ 11    Detective Noradin testified that defendant signed the statement in his presence. Detective Noradin stated that defendant was not handcuffed during any of the interviews, and denied that he or anyone else promised defendant that he would only serve six years if he confessed. The detective further stated that defendant never requested medical attention, that he never passed out, and that he did not appear to have any "medical issues" or "be in any discomfort." Detective Noradin identified a photograph of defendant, which he testified was taken "contemporaneously with [defendant's] signing of the typed handwritten statement." The photograph does not appear in the record on appeal. On cross examination Detective Noradin agreed that he did not present defendant with a preprinted *Miranda* warning form to sign.

¶ 12    Defendant testified that he was arrested at a friend's house. Around seven to ten police officers kicked in the door, and entered the home with their guns drawn. The officers began hitting defendant, telling him that he "like[d] to shoot little kids." Defendant believed that all of the officers participated in beating defendant. Defendant tried to cover himself, and felt the officers hitting and kicking him. Defendant testified that he did not believe the officers used a baton or other objects when hitting him. The officers then put him in the police car in handcuffs, and transported him to the police station where he was put in an interrogation room. Defendant testified that he was handcuffed to a metal hook in the room "the whole time." One hand was cuffed to the wall, while the other hand was free. Defendant stated that he was in handcuffs for a "long time" until detectives told him that they would remove the handcuffs and allow him to eat, use the bathroom and "do [his] necessities" if he spoke to them. Defendant was not allowed to use the bathroom until he agreed to "give a statement." Defendant could not remember if Detective Noradin was one of the detectives who he spoke to, because it had "been a long time," and

defendant did not "really recall what he looked like." Defendant agreed that the detectives who he spoke to at the station were not the same officers who arrested him.

¶ 13    Defendant also testified that the detectives told defendant that if he "made their job easier, they'[d] make [defendant's] easier." The detectives promised him that if he made the statement, he "would only serve six years" and that if defendant did not give a statement, they "could just beat [him] and they could say anything to justify it." Defendant clarified that the detectives who promised him that he would serve six years were not "[t]he ones [who had] beat[en]" defendant during his arrest.

¶ 14    Defendant further testified that when the ASA arrived, defendant told her that he had been beaten by the police officers, but she did not appear to "car[e] about that." Then, defendant "passed out in front of [the detective and ASA] in the interrogation room." Defendant stated that he "started just blacking out" and then awoke "on the floor ** all cold [and] sweaty." Defendant told the detective and the ASA that he "d[id]n't feel right" and that he "need[ed] medical attention." They responded that he would "be okay" and denied his request.

¶ 15    Defendant denied that he was informed of his *Miranda* rights at any time. He agreed that he signed the written statement, which contained *Miranda* warnings, but testified that he did not read that part of the statement. Defendant only read "[p]arts of" the statement, and agreed to sign it because he just wanted to "get it over with." Defendant agreed that he told the detectives that he felt bad about the two little girls being hurt. Defendant also identified the photograph of himself, and agreed that it did not show marks on his face or neck, and that his shirt was not bloodstained.

¶ 16    In rebuttal, the State called ASA Fialkowski, who testified that she met with defendant on June 9, 2011, and that she advised him of his *Miranda* rights. ASA Fialkowski testified that defendant never indicated that he had any injuries, that she did not observe any injuries on him,

that he never passed out in front of her, and that he never indicated to her that he was denied medical treatment.

¶ 17    Following the above testimony, the trial court denied defendant's motion to suppress his statement, finding, in particular, that that defendant's testimony was rebutted by the State's witnesses, and by his written statement, which indicated that defendant was "treated well" by the detectives and that no threats or promises had been made.

¶ 18    Thereafter, prior to the scheduled trial on May 11, 2015, defendant requested that the parties engage in a Rule 402 conference. Following that conference, defendant indicated that he wished to plead guilty. The State asserted that, in exchange for defendant's guilty plea on one count of attempted first degree murder, it would be recommending a sentence of 30 years' imprisonment, comprised of 10 years for the offense plus a 20 year firearm enhancement, and the remaining counts would be nolle prossed. Prior to accepting the plea, the court admonished defendant pursuant to Illinois Supreme Court Rule 402 to ensure his plea was knowingly and voluntarily entered. The court explained to defendant that attempted first degree murder is a Class X felony, "punishable by 6 to 30 years in the Illinois Department of Corrections," and that 20 years would be added based on a firearm enhancement, making a minimum sentence of 26 years, and maximum sentence of 50 years. Defendant agreed that he wished to accept the 30-year sentence, that he understood the charge, and that he understood he was giving up his rights to plead not guilty and have a jury or bench trial. "Other than the results of the conference," defendant acknowledged that no one threatened or promised him anything to plead guilty and that he was pleading guilty of his own free will.

¶ 19    The State then provided the following factual basis:

"on June 8, 2011, at Avondale Park, *** in the City of Chicago *** the victim, Jocelyn Rodriguez, *** was there with her father, playing in the back of the park in the play area. Along with her were other individuals playing basketball and playing in the park area.

On that date, at approximately *** 7:45 p.m., a purple minivan drove down the alley, adjacent to that park. In that minivan, was the defendant, Antonio Bucio, who would be positively identified in court by eyewitnesses.

As the van pulled past the park, this defendant exited the van, armed with a .45 caliber Ruger semi-automatic handgun. He approached the basketball court, which is adjacent to the alley; and at that point, threw up the hand signal, a crown, which is indicative of the Latin King street gang, to members playing basketball and in the park.

At that time, members in the park also responded by throwing up gang signs. The defendant then produced a silver .45 caliber automatic gun, fired several shots into the park, at individuals standing by the basketball court, who responded to his hand gestures.

He fired several times. One striking the victim, Jocelyn Rodriguez, in the back, Judge.

The Defendant then ran back into that purple van. The van then dr[o]ve off down the alley to School Street, took a left on School Street, headed east on School Street to the Kennedy Expressway.

While this was all going on, Judge, there was a CAPS meeting taking place at the fieldhouse of Avondale Park. Upon hearing the gunshots coming from the

7

back of the park, Officer Mary Jane Parks of the Chicago Police Department saw that purple van fleeing the scene, got a partial license plate description, then broadcast that over the air.

That van was subsequently located within minutes, [on the] 2500 block of *** Francisco, in the City of Chicago.

[Officer] Parks was brought to that location, positively identified that van. In that van was a .45 caliber Ruger semi-automatic gun which was recovered, tested by the Illinois State Police.

Experts would testify that that firearm was the firearm that fired the spent shell casings which were recovered at the scene of the shooting, in that alley by Avondale Park.

Within minutes of that van being recovered, Chicago Police Officer Mark Motecinos, *** stopped this defendant and a group of individuals walking in the general vicinity of that van. He made contact cards out, with the defendant's name, as well as one Adele Ramirez who was the owner of the van, Judge.

The license plate of the van was run. Miss Ramirez was found to be the owner. The police realized that they had stopped a group of individuals, including the owner of the van. The defendant's name was in that group, Antonio Bucio. A check of his background and a photograph of him revealed that he matched the description given by eyewitnesses.

A subsequent photo array was done, where two individuals positively identified the photo array of the defendant as the shooter. He was taken into custody

8

and subsequently identified by six individuals in a physical lineup, as the shooter that shot into the park, striking Miss Rodriguez.

*** Upon arrest, Judge, the defendant did give a typewritten statement to an Assistant State's Attorney and Detective, admitting his involvement."

¶ 20    Defense counsel stipulated to the factual basis. The court then asked defendant if there was "anything that [he] would like to say to [the court], before I impose sentence?" Defendant responded that he "wanted to explain, like, why everything happened; and I wanted to apologize to my victim and the family, and explain to them why it happened, if possible." The court replied that the ASA would inform "the victim and her family that you apologized in court" but that defendant would not have an opportunity to "speak personally to the victims." The court asked if there was anything else defendant wanted to say, and defendant responded,

"Well, I wanted to explain to everybody why it happened; but that's no -- I don't got no evidence to confirm that. That's my only problem, I wanted to explain to them that it's not what they made it seem it was. This only happened because I was intoxicated involuntarily, but I cannot even prove that.

So, I just wanted to let them know, it's not because I'm just somebody who does stupid things when get they drunk. It happened because of side effects I had, you know. I just wanted to let them know that I'm sorry about that, and that it's not – it's not what it looks like."

¶ 21    Defense counsel explained to the court that defendant was referencing his claim of "[in]voluntary intoxication" as a result of "an adverse reaction from a PCP-laced cigarette." Defendant agreed that "if it wasn't because I involuntary induced [*sic*] PCP intoxication, this case would never happen; but there's no way I can prove it, because I never got any blood test when I

first got arrested.  They never gave me [a] test when I requested it." Defendant stated that, "[T]wo years later, a friend of mine was explaining that a girl that gave it to me, she said, Bella, she's the one that sold me; and that's when I realized how things were; but during that time, I was already ready to, you know, cop out to anything." Defendant asserted that he and his defense counsel tried to

"work on a defense for that, but that's the argument that cannot be admitted. So, there was no really anything around it. I just wanted to, you know, let the family know, apologize and let them know that, look, it's not what – it's not what anybody says it was. This only happened because of the PCP. *** [I]f it wasn't for that, it would never have happened."

¶ 22    The court asked defendant, "So, you discussed this possible defense with your attorney?" Defendant responded, "Yes." The court then asked defense counsel, "you investigated it, is that correct?" Counsel explained that he read "just about every case" involving involuntary intoxication, including one particular case about "PCP intoxication" which showed "what a burden" defendant would have to overcome to establish the defense. Counsel stated that he explained and discussed it with defendant and his family on multiple occasions, but that there was no evidence, "other than some hearsay statements" to support the defense. Counsel noted that "it didn't appear to anybody that he was intoxicated at the time that he gave his statement *** [or] at the time of the event."

¶ 23    The court then asked defendant,

COURT: So, Mr. Bucio, you've discussed that -- those circumstances and that possible defense with your attorney, is that correct?

DEFENDANT: That is correct.

COURT: Okay. And after having those conversations, do you still wish to plead guilty?

DEFENDANT: Well, yes, because they told me I would not get those instructions. So what's the point of going to trial if I can't, you know, properly say what I need to say? So, that's my reason, too.

COURT: Anything else?

DEFENDANT: I just wanted to apologize and let them know that it's not what they think. It's not what it look like. There's always two sides to every story. I just wanted to give my side.

COURT: Well, by pleading guilty, you won't have a chance to testify. Do you understand that?

DEFENDANT: Yes.

COURT: So, that other side won't come out. Other than what you have just said. Do you understand?

DEFENDANT: Yes.

COURT: Did you still wish to plead guilty?

DEFENDANT: Yes.

¶ 24    The court accepted defendant's plea, and sentenced him to 30 years' imprisonment. The court admonished defendant that if he wanted to appeal, he was required to file a motion to vacate the judgment and withdraw his plea within 30 days.

¶ 25    Four days later, on May 14, 2015, defendant wrote a letter to the court indicating that he wanted to appeal his sentence. In court on June 5, 2015, the court addressed defendant's letter, and reiterated that in order to appeal, he needed to move to withdraw his plea. Defendant responded

that he had mailed a motion to withdraw his plea, and the court replied that the motion had not yet been received by the court clerk. The court asked defense counsel if counsel wanted to file a motion on defendant's behalf, and counsel responded that counsel did not believe it was in defendant's best interest to file such a motion. The court then continued the case to June 10, 2015, the 30th day after defendant's plea.

¶ 26 On June 10, 2015, defendant appeared in court and informed the court that he was no longer seeking to withdraw his plea. After confirming with defendant that he understood that he had to seek to withdraw his plea before he could appeal, the court ordered the matter taken off call.

¶ 27 Thereafter, defendant mailed a letter to the trial court judge, which was dated June 21, 2015, and postmarked June 23, 2015, again stating that he wanted to withdraw his plea. He asserted he had been misled by counsel into withdrawing his initial motion to withdraw his guilty plea. The court treated this letter as a motion to withdraw his guilty plea and, on August 12, 2015, denied the motion, finding that it lacked jurisdiction to consider the motion because the motion was not timely filed. Defendant appealed, and on December 21, 2017, this court granted appellate counsel's motion for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and dismissed the appeal in a summary order, finding that the trial court "properly determined that it lacked jurisdiction."

¶ 28 Meanwhile, on August 9, 2017, defendant filed the postconviction petition at issue in this appeal. Among other things, defendant alleged that his "conviction was a product of a guilty plea due to a confession that was not voluntary [and] was obtained by the use of physical coercion." Defendant referred to photographs he attached to the petition, which he asserted were taken on the day of his arrest, showing "multiple bruises on [defendant]'s body that were obtained during police custody [and] interrogation by [D]etective Anthony Noradin." Defendant also referred to a second

set of photos, which he asserted were taken two days later, showing that the "red bruised marks have already matured [and] began to develop color." Defendant stated that the detective and ASA "lie[d] on the stand in order to cover up the torture [and] abuse that was used to obtain [defendant's] confession. Defendant alleged that he was previously "scared to admit that Detective Noradin abused him as well during the interrogation, in fear that the corrupt Detective might retaliate against him and his family." Defendant asserted that if he "had the evidence he now has, his motion to suppress statements would have been granted, *** he would have t[aken] a jury trial, [and] he would [have] had a different result."

¶ 29    Defendant also contended that his guilty plea was "the product of ineffective assistance of counsel" for failure to "properly investigate[ ] the case." In particular, defendant alleged that a proper investigation would have revealed the above photographs, showing that defendant was "bruised up by the police in the interrogation process." Defendant also alleged that counsel forced him to plead guilty "by not having an effective defense," by "not fully investigating the case," and by "not telling" defendant about "crucial evidence" in his favor. In particular, defendant pointed to evidence that the gun used in the shooting had a fingerprint that did not match defendant; that defendant's DNA was not found on the gun; that initial witness descriptions were inconsistent with defendant's appearance; and that one witness identified a person other than defendant as the shooter.

¶ 30    Defendant asserted that he only learned of the above evidence, including the attached photographs, after receiving a response to a FOIA request. He further contended that, if not for counsel's ineffective assistance, defendant "would have had a more favorable outcome since he would have gone to trial instead of accepting a guilty plea."

¶ 31 Defendant's petition was advanced to second stage proceedings, and counsel was appointed.

¶ 32 Thereafter defendant filed three *pro se* supplemental petitions for postconviction relief on January 29, 2018, May 14, 2019, and April 21, 2021. As relevant to this appeal, defendant submitted an affidavit, in which he alleged that Detective Noradin

> "beat me, punched me, hit me over my right forearm with a blunt object that I blocked when aimed to my head, as I was handcuffed to a metal ring on the wall by my left hand. The detective continue[d] to beat me [and] said that they can say whatever they want to justify their actions on [sic] abusing me [and] will be believed since their [sic] cops [and] I'm a gang member, that if I do not confess [it] is going to get 'worse' then the detective told me if I make his job easier he will do mines [sic] and promised me leniency [and] a 6 year sentence if I confess to the crime I did not do. He told me the details of the crime and coached my confession. I agreed to stop the abuse [and] because I did not want to have him hurt or frame any of my family members."

¶ 33 Meanwhile, on January 14, 2021, prior to the filing of defendant's third *pro se* supplemental petition, post-conviction counsel filed his 651(c) certificate stating that he consulted with defendant, reviewed the record and did not make amendments to the *pro se* filing because it provided an adequate presentation of defendant's contentions.

¶ 34 On May 5, 2021, counsel filed an amended Rule 651(c) certificate, indicating that counsel was not amending defendant *pro se* filings because they provided an adequate presentation of defendant's contentions.

¶ 35     That same day, the trial court held a hearing, during which the court and counsel discussed defendant's *pro se* filings while represented by counsel. The court indicated that it was not going to "strike these [supplemental] petitions at this point in time, but I'm likely to in the future." The court advised defense counsel that, if he "s[aw] any merit in any of the arguments, I would like you to file the appropriate supplemental postconviction petition as his attorney." Counsel informed the court that he had just filed an amended 651(c) certificate, and was not planning to file an amended petition. Defense counsel asked the court to consider defendant's *pro se* supplemental petitions without an amended petition. The ASA noted the extensive nature of defendant's *pro se* filings—"It is three inches of handwritten documents with attachments ** [and] there's notes on each one." The ASA explained that the State could

> "go through all of these and figure out what issues need to be addressed, yes, but counsel is counsel. If the defendant wants to be *pro se* and file these after his 2017 initial petitions, then he can be *pro se*. Otherwise I would ask that counsel file one document for the Court to review."

¶ 36     The court agreed, telling defense counsel: "You're the lawyer. You file whatever you need to file that you think is appropriate and that's it. *** If he wants to be *pro se*, tell him to be *pro se*."

¶ 37     Thereafter, on July 22, 2021, defendant filed a motion to proceed *pro se*. Defendant asserted that he was informed by counsel that the State was seeking to strike defendant's *pro se* supplemental filings because defendant was represented by counsel at the time they were filed, and that the court had indicated that the filings would "remain" if defendant chose to represent himself. Accordingly, defendant asked the court to allow his counsel to withdraw so that he could represent himself "and have all the issues raised in [his] three *** *pro se* filings *** addressed."

¶ 38    Defense counsel filed a motion to withdraw, which the post-conviction court granted after admonishing petitioner as to his request to proceed *pro se* at an October 4, 2021, hearing.

¶ 39    On January 11, 2022, the State filed a motion to dismiss defendant's petition for post-conviction relief. The State argued, among other things, that there was no documentary support for defendant's allegations of misconduct by the police and the ASA, and that his claims were barred by *res judicata* where defendant's counsel filed and litigated a motion to suppress defendant's statements. The State also asserted that the information defendant was "using is not new" nor was it of such a conclusive nature to have changed the result of his plea. Finally, the State argued that defendant's guilty plea waived all of his claims.

¶ 40    On March 11, 2022, defendant filed a response to the State's motion to dismiss. Defendant alleged that his confession was coerced, and that Detective Noradin "beat [defendant] into a false/forced confession." Defendant noted that he had attached pictures of the bruises which showed that Detective Noradin was lying when he said that defendant "was never handcuffed" and never "had any bruises or marks on [his] body." In particular, defendant alleged that one bruise was caused when Detective Noradin "bashed [defendant] with his police flashlight on [defendant]'s right arm as [defendant] was cuffed to a metal ring from [his] left arm." Finally, defendant clarified that he was "not claiming actual innocence."

¶ 41    On January 30, 2023, the trial court entered a written order granting the State's motion to dismiss. The trial court initially determined that defendant's claims were waived by entering a guilty plea, and that they also "fail[ed] as a matter of law." As to defendant's claim of police coercion, the court found the issue barred by *res judicata* because defendant previously litigated a motion to suppress his statement. The court also found that defendant could not establish that his counsel was ineffective because counsel "did challenge his statements to police." Moreover,

16

defendant's claim that counsel should have found evidence of police misconduct failed where the defendant claimed that the proposed evidence was "newly discovered" after defendant made a FOIA request, and defendant's "attorney cannot be ineffective for failing to discover evidence that could not have been discovered sooner."

¶ 42    Defendant filed a timely notice of appeal, and in this court, defendant contends that the trial court erred in granting the State's motion to dismiss, because he made a substantial showing of ineffective assistance. Specifically, defendant contends that counsel was ineffective for failing to introduce "booking photographs showing bruising on his body during a hearing on his motion to suppress," and for failing to "discuss discovery with him prior to advising him to enter a guilty plea."[1]  Defendant also contends that his petition presented "new evidence of police misconduct" which should warrant "an evidentiary hearing to determine whether he had been physically abused during his interrogation."

¶ 43    The Act allows defendants to challenge their convictions based on an alleged violation of their state or federal constitutional rights. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. Postconviction proceedings follow three stages. *Id*. In this case, defendant's petition was dismissed at the second stage. At the second stage, a defendant must make a substantial showing of a constitutional violation. *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 16.

¶ 44    If the State moves to dismiss the petition at the second stage, the court may not "engage in any fact-finding or credibility determinations" and must take "all well-pleaded facts that are not positively rebutted by the original trial record" as true. *People v. Domagala*, 2013 IL 113688, ¶

---

[1] In defendant's opening brief, he also contended that counsel was ineffective for failing to "file a motion to suppress the fruits of an illegal arrest made pursuant to an investigative alert." Defendant withdrew that claim in his reply brief, based on our supreme court's decision in *People v. Clark*, 2024 IL 127838.

35. If the court determines that a defendant has made a substantial showing of a constitutional violation, the petition proceeds to a third-stage evidentiary hearing. *Id*. ¶ 34. If not, the petition is dismissed. *People v. Tate*, 2012 IL 112214, ¶ 10. A dismissal of a petition at the second stage is reviewed *de novo*. *People v. Dupree*, 2018 IL 122307, ¶ 29.

¶ 45    As a threshold matter, the State contends that defendant's guilty plea waived any claim of ineffective assistance based on counsel's performance at the motion to suppress defendant's statements. Defendant responds that the State's waiver argument should be rejected because "state and federal constitutions guarantee defendants the right to the effective assistance of counsel at every stage of the proceedings, including hearings on a motion to suppress." Defendant contends that after a guilty plea, a petitioner need only show that counsel acted deficiently, and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

¶ 46    It is well established that "a voluntary guilty plea waives all non-jurisdictional errors or irregularities, including constitutional errors." *People v. Townsell*, 209 Ill. 2d 543, 545 (2004).

¶ 47    In *Tollet v. Henderson*, 411 U.S. 258 (1973), the US Supreme Court explained:

> "[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*." *Id.* at 267 (citing *McMann v. Richardson*, 397 U.S. 759, 770–71 (1970) (where a

defendant pleaded guilty on advice of counsel based on counsel's "misjudg[ment] [as to] the admissibility of the defendant's confession," such advice would only support a claim that the guilty plea was "unintelligent" where the defendant could demonstrate that counsel's advice to enter a guilty plea was not "within the range of competence demanded of attorneys in criminal cases")).

¶ 48    Here, defendant's challenge to counsel's effectiveness does not raise any claim that the court lacked jurisdiction.  See *People v. Jones*, 2021 IL 126432, ¶ 20; *People v. DeLong*, 2024 IL App (5th) 230648-U, ¶ 27 ("Ineffective assistance by defense counsel, a constitutional error, has nothing to do with the jurisdiction of the circuit court."). Nor does defendant's challenge bear on the voluntariness of his plea. See *People v. Phelps*, 51 Ill. 2d 35, 38 (1972); *People v. Williams*, 2023 IL App (1st) 191309-U, ¶ 26 (defendant's "claim of ineffective assistance of counsel does not revolve around the *voluntariness* of his plea. Rather, [defendant] claims that his trial counsel was ineffective for not moving to suppress his confession considering the circumstances surrounding his confession.") (internal citation omitted) (Emphasis in original); *People v. Rosas*, 2024 IL App (5th) 240720-U, ¶ 28 ("The denial of the suppression motion may partially explain defendant's decision to plead guilty, but it does not make the plea involuntary.").

¶ 49    Defendant cites the standard that a defendant may "only attack the voluntary and intelligent character of the guilty plea," but stops short of asserting that his guilty plea was not voluntary or intelligent. Rather, he contends that, by arguing that he would not have pleaded guilty if not for counsel's failure to "identify or adequately litigate" his suppression claim, he has met this standard.

¶ 50    There is, however, an important distinction between claims of ineffective assistance which occur during plea process and which pertain to the voluntary or intelligent nature of the plea, and those that occur prior to a guilty plea, which a defendant waives by choosing to plead guilty.

Compare *People v. Hughes*, 2012 IL 112817, ¶ 60 (plea counsel performs deficiently where he or she fails to "advise a defendant who pleads guilty to a triggering offense subject to the provision of the Sexually Violent Persons Commitment Act that he will be evaluated for and may risk involuntary commitment after completing his prison term.") and *People v. Smith*, 383 Ill. App. 3d 1078, 1086 (2008) (a defendant's claim that "she is actually innocent and her trial counsel was ineffective for failing to investigate and present a defense of compulsion" does not "attack her guilty plea as being either involuntary or unknowing. *** All the errors that defendant contends her trial counsel committed relate to claims she voluntarily relinquished when she pled guilty, and we will not consider her attorney's alleged deficient performance on issues that defendant waived.").

¶ 51    In light of the above, we conclude that defendant's guilty plea waived any argument that counsel was ineffective for his performance related to the motion to suppress. See *People v. Ivy*, 313 Ill. App. 3d 1011, 1017 (2000) (defendant barred from arguing in postconviction petition that trial counsel was ineffective for failing to file motion to suppress, as the alleged failure "occurred prior to the entry of defendant's guilty plea").

¶ 52    We also reject defendant's claim that his petition presented "new evidence of police misconduct," for the same reason. Defendant contends that, where he has raised a claim of physical abuse "and support[ed] that claim with new evidence that the police have engaged in a pattern-and-practice of physically abusive behavior, [defendant]'s claim *must* advance to an evidentiary hearing unless it is contradicted by the record." (Emphasis in original).

¶ 53    None of the authority defendant relies on for this claim involves a guilty plea.  As explained above, a voluntary guilty plea waives all non-jurisdictional errors or irregularities, and courts have repeatedly explained that this includes claims that a defendant's confession was coerced. *Johnson*,

2021 IL App (1st) 152310, ¶¶ 21, 38 ("Illinois courts have repeatedly held that claims regarding the voluntariness of defendants' confessions are barred by the rule that voluntary guilty pleas waive all nonjurisdictional defects. *** [L]ongstanding federal and state caselaw specifically makes clear that where a defendant voluntarily pleads guilty, he waives all nonjurisdictional defects, including any claim that his confession was coerced by police torture."); *Phelps*, 51 Ill. 2d at 38; *People v. Stice*, 160 Ill. App. 3d 132, 138-39 (1987)). In *Phelps*, 51 Ill. 2d 35, our supreme court affirmed the denial of a postconviction petition in which defendant claimed his confession was coerced, rendering his confession and subsequent guilty plea involuntary. The *Phelps* court held:

> "It is unnecessary to determine the legality of petitioner's original detention or the voluntary nature of his confession since a voluntary plea of guilty waives all nonjurisdictional errors. [Citation.] Likewise, that petitioner may have been motivated by his coerced confession does not invalidate his otherwise knowing and intelligent plea of guilty [citations], since that plea represented a voluntary and intelligent choice of the alternatives available to him." *Id.* at 38.

¶ 54 Accordingly, we find defendant's claim that he should be permitted to introduce new evidence that his plea was coerced, to be waived as well.

¶ 55 Defendant, however, requests that, even if this court decides that his claims are waived, we should still consider them on their merits "to prevent a fundamental miscarriage of justice." Defendant cites *People v. Flores*, 153 Ill. 2d 264, 274 (1992), for the proposition that "where fundamental fairness so requires, strict application of procedural bars may be relaxed."

¶ 56 Our supreme court, however, has instructed that an appellate court has "no authority *** to reach the merits" of a claim that defendant waived by pleading guilty. *Townsell*, 209 Ill. 2d at

548; see also *People v. Ratliff*, 2024 IL 129356, ¶ 26. As the supreme court explained in *Ratcliff*:

> "Though forfeiture may be a limitation on the parties, and not this court, we have never stated that the same is true of waiver, and with good reason. Forfeiture may be inadvertent—a failure to make a timely assertion of a right. [citation]. Waiver, by contrast, is never inadvertent because it is an intentional relinquishment of a right." *Id.*

¶ 57    Accordingly, where defendant waived the above claims by pleading guilty, we decline defendant's request to reach their merits.

¶ 58    We thus turn to defendant's remaining argument, that counsel was ineffective for "failing to discuss the discovery with him before advising him to plead guilty." Unlike the claims set out above, defendant's guilty plea does not waive such a claim, as it challenges the effectiveness of counsel in ensuring the intelligent nature of defendant's plea.  See *People v. Hall*, 217 Ill. 2d 324, 335 (2005).

¶ 59    A challenge to a guilty plea alleging ineffective assistance of counsel is subject to the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984). *People v. Hatter*, 2021 IL 125981, ¶ 25; *People v. Rissley*, 206 Ill. 2d 403, 457 (2003). Under *Strickland*, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and the defendant was prejudiced by counsel's substandard performance. *Strickland*, 466 U.S. at 687; *People v. Lawton*, 212 Ill. 2d 285, 302 (2004). An attorney's conduct is deficient if the attorney failed to ensure that the defendant's guilty plea was entered voluntarily and intelligently. *Hall*, 217 Ill. 2d at 335. To establish the prejudice prong of an ineffective assistance of trial counsel claim in the guilty plea context, the defendant must show there is a reasonable probability that, absent counsel's alleged errors, the defendant would have pled not guilty and insisted on going to trial.

*People v. Valdez*, 2016 IL 119860, ¶ 29 (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), and *Hughes*, 2012 IL 112817, ¶ 63); *Rissley*, 206 Ill. 2d at 457. A conclusory allegation that a defendant would not have pled guilty and would have demanded a trial is insufficient to establish prejudice. *Hughes*, 2012 IL 112817, ¶ 64; *Hall*, 217 Ill. 2d at 335. Rather, when a defendant who pleads guilty raises a claim of counsel's incompetence concerning a matter of defense strategy, the claim must be accompanied by either a claim of actual innocence or the articulation of a plausible defense that could have been raised at trial. *Rissley*, 206 Ill. 2d at 459-60. The question of whether counsel's deficient representation caused the defendant to plead guilty depends in large part on predicting whether the defendant likely would have been successful at trial. *People v. Pugh*, 157 Ill. 2d 1, 15 (1993) (citing *Hill*, 474 U.S. at 59).

¶ 60    Decisions regarding which discovery items a defense attorney chooses to share with or discuss with his or her client is a matter of trial strategy. *People v. Savage*, 361 Ill. App. 3d 750, 757 (2005). Accordingly, the decision is afforded a strong presumption that it was the product of sound trial strategy rather than incompetence. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). "[T]he strong presumption that counsel's strategy was sound may be overcome where counsel's decisions appear to be so irrational that no reasonably effective defense attorney in similar circumstances would pursue such a strategy." *People v. Peterson*, 2017 IL 120331, ¶ 80. A defendant may show deficient performance if counsel "withheld discovery information that cast doubt on the State's ability to prove him guilty or was otherwise particularly relevant to his decision to plead guilty." *People v. Walker*, 2019 IL App (3d) 170374, ¶ 18.

¶ 61    The State contends that this court should affirm the dismissal of defendant's claim because he has not claimed actual innocence, nor has he articulated any defense that could have been raised at trial.  Defendant responds that , although he has not made a claim of "actual innocence," he "has

claimed innocence," and he "has clearly articulated a defense he would assert if this case were remanded for a new trial: the State could not prove his guilt beyond a reasonable doubt."

¶ 62    A bare assertion of "innocence," however, is not sufficient. Our supreme court has explained that that "a defendant must assert either a claim of *actual innocence* or articulate a plausible defense that could have been raised at trial." (Emphasis added) *Hughes*, 2012 IL 112817, ¶ 64. Defendant, however, expressly disclaimed that he is raising a claim of actual innocence in his filings at issue in this appeal, and the evidence that defendant contends was withheld from him does not cast doubt on the State's ability to prove defendant's guilt.

¶ 63    Specifically, defendant contends that evidence existed to show that he was not tested for gunshot residue, that defendant's DNA was not found on the gun, and that police found a fingerprint on the gun that did not match defendant. Defendant also contends that witnesses at the scene provided inconsistent descriptions of the gunman, that certain clothing they described did not match the clothes defendant was wearing, and that one witness identified someone else as the gunman during a show-up identification.

¶ 64    The State initially disputes defendant's characterization of the evidence he claims was not discussed with him. The State asserts that the records he provides show only that "a DNA swab of the gun was taken, but no information was included regarding the results of the swab"; that there are no "documents that establish whether he was tested for gunshot residue"; and that the alleged "inconsistent descriptions" of the shooter and his clothing come from a single page of a detective supplemental report where it is not clear who the witness was describing. The State also contends that the reference to another person being identified as the shooter is vague, as it "is unclear who identified him, if he was an associate of [defendant] or if there was more than one person shooting at the park."

¶ 65    Even assuming we were to accept defendant's characterization of the evidence that he claims counsel failed to discuss with him, none of that evidence would have provided a plausible defense that would have made it rational to reject the plea offer and go to trial.

¶ 66    In contrast to the evidence set forth by defendant in his petition, the State's factual basis established that defendant would be positively identified in court by multiple witnesses as the gunman who pulled up to Avondale Park in a purple minivan, exited the vehicle, and displayed gang hand signals to other gang members playing basketball, before firing several shots into the park. The factual basis also indicated that a police officer observed the purple minivan fleeing the scene and was able to get a partial license plate description. Within minutes of the shooting, the vehicle was abandoned, and defendant was found walking nearby accompanied by the owner of that vehicle. Officers recovered a .45 caliber Ruger semi-automatic gun from the abandoned vehicle, and that firearm was compared to the spent shell casings recovered at the scene. Experts would testify at trial that the firearm recovered from the vehicle was the same firearm used in the shooting. Two witnesses positively identified defendant in a photo array as the shooter, and six witnesses identified defendant as the shooter in a physical lineup. Thereafter, defendant was interrogated by police, confessed, and signed a typewritten statement. Defendant stipulated to this factual basis in pleading guilty, and we further note that defendant apologized to the victim and her family at the guilty plea hearing, asserting that he would not have committed the offense if he had not ingested a PCP-laced cigarette.

¶ 67    The fact that defendant's DNA and fingerprints were not found on the gun, that he was not tested for gunshot residue, or that there were "inconsistencies" in witnesses' descriptions of the offender, do not cast doubt on the State's ability to prove defendant's guilt of the offense. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶¶ 75-76 (the State was not required to present

physical evidence such as gunshot residue or fingerprints that linked the defendant to a shooting in order to prove him guilty beyond a reasonable doubt); *People v. Bennett*, 154 Ill. App. 3d 469, 475 (1987) ("[T]he lack of fingerprint evidence does not necessarily raise a reasonable doubt as to guilt," rather, "it is unnecessary and cumulative where there is eyewitness testimony."); *People v. Allen*, 377 Ill. App. 3d 938, 944 (2007) (the absence of DNA evidence on a handgun would not exonerate the defendant); *People v. Slim*, 127 Ill. 2d 302, 309 (1989) ("The presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made."). Even defendant's contention that one witness identified someone else as the shooter is of little significance where the State's factual basis established that defendant was identified as the shooter by two witnesses in a photo array and by six witnesses in a physical lineup. Comparing the compelling evidence of guilt that defendant stipulated to in pleading guilty to the evidence that defendant now claims was not discussed with him, we find no reasonable probability that, had counsel discussed that evidence with defendant, he would have pleaded not guilty and insisted on going to trial.

¶ 68 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County, dismissing defendant's postconviction petition at second stage of proceedings.

¶ 69 Affirmed.